# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-1923

ANN BOGIE,

*Plaintiff-Appellant,*

*v.*

JOAN ALEXANDRA MOLINSKY
SANGER ROSENBERG a/k/a JOAN RIVERS,
IFC FILMS LLC, BREAK THRU FILMS, INC.,
RICKI STERN, ANNIE SUNDBERG, and SETH KEAL,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 11-cv-0324—**William M. Conley**, *Chief Judge.*

ARGUED SEPTEMBER 24, 2012—DECIDED JANUARY 17, 2013

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Ann Bogie appeals the district court's dismissal of her claims under Wisconsin law for invasion of privacy and misappropriation of her image. The claims are based on Bogie's attendance at a comedy performance by defendant Joan Rivers, sued

here under her full name, Joan Alexandra Molinsky
Sanger Rosenberg. Shortly after the show, Bogie ap-
proached Rivers in the backstage area of the Lake of the
Torches Casino in Lac du Flambeau, Wisconsin. After
autographing a copy of her book, Rivers had a brief
conversation with Bogie. This sixteen-second exchange
was filmed (we must assume without Bogie's consent)
and included in a documentary film on Rivers that
was sold nationwide.

Bogie has sued Rivers, her production company, and
others for invasion of privacy and misappropriation
of her image under Wis. Stat. § 995.50(2)(a)-(b). The case
was filed in state court but was removed to federal
court under diversity jurisdiction. The district court
granted defendants' motion to dismiss both claims with
prejudice for failure to state a claim. Bogie appeals.
Because we agree with the district court that no set
of facts could exist consistent with the complaint
that would allow these claims to survive, we affirm
the judgment.

I. *Factual and Procedural Background*

   A. *Plaintiff's Allegations and the Film*

Bogie attended a stand-up comedy show featuring
Rivers. During the performance, Rivers told a joke about
the deaf and blind Helen Keller, offending an audience
member who had a deaf son. The audience member
heckled Rivers, and the two had a brief but sharp exchange
that was also captured on film and was part of the docu-
mentary. Immediately after the show, Rivers exited to a

backstage area closed to the general public. Bogie gained entry to this backstage area and asked Rivers to sign a copy of her book. Bogie engaged Rivers in a short conversation during which Bogie expressed frustration with the heckler and sympathy for Rivers. Rivers responded with an expression of sympathy for the heckler. The conversation went as follows:

> Bogie:  Thank you. You are so . . . I never laughed so hard in my life.

> Rivers: Oh, you're a good laugher and that makes such a difference.

> Bogie:  Oh, I know. And that that rotten guy . . . .

> Rivers: Oh, I'm sorry for him.

> Bogie:  I was ready to get up and say . . . tell him to leave.

> Rivers: He has a, he has a deaf son.

> Bogie:  I know.

> Rivers: That's tough.

> Bogie:  But he's gotta realize that this is comedy.

> Rivers: Comedy.

> Bogie:  Right.

The film shows there were at least three other individuals present during this exchange: a uniformed security guard and two other men who appeared to work for or were at least associated with Rivers. They were all within a few feet of both Bogie and Rivers.

The interaction was filmed and included in the documentary entitled *Joan Rivers: A Piece of Work*. Bogie's conversation lasted sixteen seconds in the film's eighty-two minutes, or 0.3 percent of the entire film. The documentary was distributed and sold nationwide, including in Wisconsin. It enjoyed a positive reception and significant press coverage, touted for shedding light not only on Rivers's long career but also on the public's obsession with show business generally.

Plaintiff Bogie alleges that she was portrayed in the film as having approved of condescending and disparaging remarks by Rivers toward Wisconsin, its citizens, and the heckler. Bogie's complaint alleges that her privacy was invaded by the distribution of the film and that the film misappropriated her image for commercial purposes without her consent. Bogie seeks compensatory damages and an injunction against further distribution of the film.

B. *The District Court Decision and the Standard of Review*

The district court granted the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted. The video recording of the documentary was incorporated in Bogie's complaint, and the district court relied on its viewing of the video to decide the case. The district court ruled that no reasonable person in plaintiff's position could have considered the backstage area private, nor could the alleged intrusion have been considered highly offensive by a reasonable person. Bogie's

invasion of privacy claim under section 995.50(2)(a) thus failed as a matter of law. The district court also found that the appropriation claim under section 995.50(2)(b) failed because it was subject to at least two separate common law exceptions: the newsworthiness or public interest exception, and the incidental use exception. The court concluded that amendment of the complaint would have been futile as to either claim, so its dismissal was with prejudice.

We review *de novo* a district court's dismissal of a claim pursuant to Rule 12(b)(6), construing the allegations in the complaint in the light most favorable to the non-moving party and giving that party the benefit of reasonable inferences from those allegations. *Citadel Group Ltd. v. Washington Regional Medical Center*, 692 F.3d 580, 591 (7th Cir. 2012); *Reger Development v. National City Bank*, 592 F.3d 759,763 (7th Cir. 2010). "Under the federal rules' notice pleading standard, a complaint must contain only a 'short and plain statement of the claim showing that the pleader is entitled to relief.' Fed. R. Civ. P. 8(a)(2)." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012).

When a complaint fails to state a claim for relief, the plaintiff should ordinarily be given an opportunity, at least upon request, to amend the complaint to correct the problem if possible. See Fed. R. Civ. P. 15(a); *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) (reversing dismissal with prejudice); *Foster v. DeLuca*, 545 F.3d 582, 584-85 (7th Cir. 2008) (reversing dismissal with prejudice where district court did not explain

reason for denying leave to amend). Leave to amend need not be granted, however, if it is clear that any amendment would be futile. *Garcia v. City of Chicago*, 24 F.3d 966, 970 (7th Cir. 1994).

## C. *District Court's Review of the Video on Motion to Dismiss*

Bogie incorporated the video recording into her original complaint both by reference and by physically attaching the video recording to the amended complaint. The video shows in real time the content and context of the alleged wrongs. Bogie's complaint alleges that she was "back stage in a place that the public was prohibited from entering, and which a reasonable person, including the Plaintiff, would consider private." The district court viewed the recording and weighed its content against the complaint's allegations. In considering a motion to dismiss under Rule 12(b)(6), district courts are free to consider "'any facts set forth in the complaint that undermine the plaintiff's claim.'" *Hamilton v. O'Leary*, 976 F.2d 341, 343 (7th Cir. 1992), quoting *R.J.R. Services Inc. v. Aetna Casualty & Surety Co.*, 895 F.2d 279, 281 (7th Cir. 1989). The freedom includes exhibits attached to the complaint, Fed. R. Civ. P. 10(c), or documents referenced in the pleading if they are central to the claim, *Citadel Group Ltd.*, 692 F.3d at 591. "Taking all facts pleaded in the complaint as true and construing all inferences in the plaintiff's favor, we review the complaint and all exhibits attached to the complaint." *Forrest v. Universal Savings Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007); see also *Brownmark Films, LLC*

*v. Comedy Partners*, 682 F.3d 687, 690-91 (7th Cir. 2012) (stating that it would make "eminently good sense" to extend incorporation-by-reference doctrine to video recording of television show that allegedly infringed copyright, but reserving decision on issue).

When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss. *Forrest v. Universal Savings Bank, F.A.*, 507 F.3d at 542 ("Where an exhibit and the complaint conflict, the exhibit typically controls."). Cf. *Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974) ("If the appended document, to be treated as part of the complaint for all purposes under Rule 10(c), Fed. R. Civ. P., reveals facts which foreclose recovery as a matter of law, dismissal is appropriate."). As we said in *Brownmark Films*, it makes "eminently good sense" to apply these principles to video recordings attached to or referenced in a complaint, and we do so here. See 682 F.3d at 690-91. Because Wisconsin privacy law turns in part on the reasonable expectation an individual would have in the environment in question, we agree with the district court that the entire first claim can be resolved as a matter of law by observing the scene in the video.

When an exhibit contradicts the allegations in the complaint, ruling against the non-moving party on a motion to dismiss is consistent with our obligation to review all facts in the light most favorable to the non-moving party. We have explained that, "[s]uch an

analysis is no different than that involved in contract disputes in which a plaintiff attaches a contract to the complaint and makes an allegation that the contract on its face clearly disputes." *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 456 (7th Cir. 1998). That is not to say that a plaintiff cannot contradict the apparent meaning or significance of a document or other exhibit. Consider, for example, a complaint alleging that the plaintiff's signature on the attached contract or other instrument was obtained by fraud or coercion. But a plaintiff whose case relies on contradicting such an attachment needs to explain her position.

II. *Legal Analysis*

A. *The Language and Legislative History of Section 995.50 and Subsection 3*

Because Wisconsin substantive law applies to plaintiff's claims, our task is to interpret the state's law as we predict the state's highest court would. *E.g.*, *Pisciotta v. Old National Bancorp*, 499 F.3d 629, 634-35 (7th Cir. 2007); see generally *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). Before a more detailed analysis of plaintiff's claims for invasion of privacy, it may be useful to highlight an unusual aspect of applicable Wisconsin law of invasion of privacy. Subsection 3 of Wis. Stat. § 995.50 provides in part that the right of privacy "shall be interpreted in accordance with the developing common law of privacy . . . with due regard for maintaining freedom

of communication, privately and through the public media." In drafting section 995.50, the Wisconsin legislature used New York's privacy statute as a model. Judith Endejan, Comment, *The Tort of Misappropriation of Name or Likeness Under Wisconsin's New Privacy Law*, 1978 Wis. L. Rev. 1029, 1034 & n.30 (1978). The text of subsection 995.50(2)(b) duplicates nearly verbatim New York Civil Rights Law § 50, so "[c]ase law under the New York privacy statute may be particularly useful because subsection (2)(b) was modeled after the New York law." *Id.* at 1041 (internal citations omitted). Sound analysis of Wisconsin privacy law as codified in section 995.50 therefore includes consideration of the developing common law of privacy in Wisconsin, as well as in other jurisdictions, especially in New York. See, *e.g.*, *Fischer v. Mt. Olive Lutheran Church*, 207 F. Supp. 2d 914, 928 (W.D. Wis. 2002) (explaining that earlier codification of section 995.50 stated: " '[t]he right of privacy recognized in this section shall be interpreted in accordance with the developing common law of privacy,' which supports a reading in accordance with the general common law as reflected by the *Restatement*").

B.  *Invasion of Privacy*

We now turn to the claims Bogie presents on appeal, first to the invasion of privacy claim. To prevail on this claim, Bogie must allege and ultimately prove two things: (1) her conversation with Rivers was "in a place that a reasonable person would consider private;" and (2) the alleged intrusion on her privacy through filming was

"highly offensive to a reasonable person." Wis. Stat. § 995.50(2)(a). The complaint and the film attached to it show that both elements are lacking as a matter of law.[1]

### 1. *Reasonable Expectation of Privacy*

Bogie claims on appeal that the district court lacked a sufficient evidentiary basis for finding that no reasonable person could have had an expectation of privacy backstage. In evaluating situations in which there could be a reasonable expectation of privacy, we consider the context, facts, and circumstances. Bogie must have had a reasonable expectation of privacy either in the area itself or in the items in the area. *K.H. Doe v. Saftig*, 2011 WL 1792967, at *14 (E.D. Wis. May 11, 2011).

As the district court noted, the conversation "occurred in what appears to be a relatively crowded backstage area, with the din of chatter in the background. The camera, and thus the camera person, appear to be in

---

[1] Subsection 1 of section 995.50 grants relief based on the ensuing subsections only to "one whose privacy is unreasonably invaded." If this element of unreasonableness is read to apply to the entire statute (*i.e.* to subsections 2 and 3), then Bogie would also have to show the unreasonableness of the invasion itself as an independent element. The Wisconsin Supreme Court recently declined to decide this issue on certification by the state's Court of Appeals. See *Habush v. Cannon*, 822 N.W.2d 883 (Wis. 2012) (table). We also need not answer the question in this case.

close proximity to Rivers and Bogie." Furthermore, as defendants point out in their brief, the "autograph session" and conversation took place immediately after Rivers exited the stage in the plain view and company of four other individuals. Joint App., Ex. A 1:07:06-50. After the autograph session, Rivers left the casino as even more people appeared on camera in the back-stage area.

Bogie must therefore establish that a reasonable person could have an expectation of privacy when visiting a celebrity performer's backstage area where the general public, of which Bogie was a member, was not allowed, but where at least several others were present. (This case does not concern a private dressing room or the like.) The Restatement of Torts explains that the invasion of privacy tort protects people from "one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns." Restatement (Second) of Torts § 652B. Cf. *Munson v. Milwaukee Bd. of School Directors*, 969 F.2d 266, 271 (7th Cir. 1992) (dismissing claim as frivolous for failure to allege reasonable expectation of privacy where surveilling party did not trespass on private property).

The record does not indicate how Bogie obtained access to the backstage area beyond the assertion in Bogie's brief in the district court that she was invited back. Assuming that Bogie was invited backstage, that would not advance her claim of a reasonable expectation of privacy. The film shows that any such invitation was to obtain a backstage autograph from a celebrity in the

presence of several security personnel and a film crew. No reasonable person would expect privacy in that situation.

Bogie argues that this question cannot be decided fairly on a motion to dismiss and that she needs discovery for further factual development. She cites a multitude of cases saying that disputes involving a reasonable expectation of privacy are fact-sensitive and context-dependent. We endorse that common sense proposition, but it does not help Bogie in this case. Her argument that "Segment 12 reveals remarkably little about the backstage environment" is not persuasive when the film shows the environment at issue. We do not mean to suggest that under Rule 12(b)(6) a plaintiff's pleadings cannot ever override or provide relevant context to a video recording. We also recognize that any photograph or film shows only one perspective on a scene, so that additional perspectives, such as eyewitness testimony or photographs or films from different angles or different times, might reveal additional facts that would change the legal analysis. See generally *Scott v. Harris*, 550 U.S. 372, 378-81 (2007) (directing entry of summary judgment based on video recording of disputed police chase); *id*. at 389-91 (Stevens, J., dissenting) (drawing different conclusions from watching video recording). Also, "[a] party who appeals from a Rule 12(b)(6) dismissal may elaborate on her allegations so long as the elaborations are consistent with the pleadings." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d at 555. Bogie's complaint and her arguments on appeal, however, have not identified any potential basis for undermining the

district court's reasoning about the expectation of privacy. This failure to identify additional facts that could create a reasonable expectation of privacy or a highly offensive invasion of this privacy makes amendment of the complaint a futile exercise that the district court rightly denied.

In dismissing on the pleadings an invasion of privacy claim brought by a public official who was filmed at a casino, another federal court observed that a casino is not

> a place where a reasonable person would expect privacy, such as one's home. Indeed, any person in a casino in Las Vegas would expect to be filmed and observed by the establishment's security. Ms. Harris clearly would expect persons to pass her by and observe her gambling. Accordingly, there was no invasion of her private space and no intrusion into her legitimately private activities that revealed intimate personal facts.

*Harris v. City of Seattle*, 2003 WL 1045718, at *5 (W.D. Wash. Mar. 3, 2003). Here, although Bogie was backstage rather than at a slot machine, the reasoning is still relevant. She voluntarily approached a celebrity just after a public performance. Any reasonable person would expect to encounter some kind of a security presence, and indeed here that presence was visible. Furthermore, the camera crew must have also been visible to Bogie as they were filming both Rivers and, of course, Bogie. Courts have found that even performers themselves cannot count on a reasonable expectation of privacy in their own backstage areas. *People for the Ethical Treatment of Animals a/k/a PETA v. Bobby Berosini,*

*Ltd.*, 895 P.2d 1269, 1282 (Nev. 1995) (finding no reasonable expectation of privacy where "Gesmundo filmed activities taking place backstage at the Stardust Hotel, an area where Gesmundo had every right to be, and the filming was of a subject that could be seen and heard by any number of persons"). The point applies with more force to backstage visitors. The video and complaint show as a matter of law that the actual circumstances of the backstage area did not support a reasonable expectation of privacy.

### 2. *Highly Offensive to a Reasonable Person*

To succeed in her section 995.50(2)(a) claim, Bogie must also show that the alleged intrusion into her privacy would be highly offensive to a reasonable person. "The question of what kinds of conduct will be regarded as a 'highly offensive' intrusion is largely a matter of social conventions and expectations." J. Thomas McCarthy, *The Rights of Publicity and Privacy,* § 5.1(A)(2) (1993); *Gillund v. Meridian Mutual Insurance Co.,* 323 Wis. 2d 1, 20 (Wis. App. 2009) (describing the evaluation of what is highly offensive as an objective test). In conducting this evaluation, we consider

> the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded.

*PETA v. Bobby Berosini, Ltd.*, 895 P.2d at 1282 (citations omitted). The intrusion must be the "result of conduct

to which the reasonable man would strongly object." Restatement (Second) of Torts § 652B cmt. d (1977).

Bogie relies on three factors to argue the intrusion of the camera was highly offensive: she was filmed without her consent, the filming was motivated by profit, and the filming captured her "private expression of scorn," displaying her insensitivity to the heckler's deaf son. We consider each in turn.

### a. *Lack of Consent*

Bogie's first proposed factor, the lack of consent, does not advance her claim. We have assumed lack of consent at this stage in the proceedings. Restating it as a factor that should increase the offensiveness of the alleged intrusion adds nothing to the analysis. To be actionable at all, the filming would need to occur without the plaintiff's consent or at least exceed the scope of the plaintiff's valid consent. Put differently, consent operates here more as an affirmative defense than as an element of the tort; lack of consent is a makeweight of sorts and does not do anything more than make Bogie's claim theoretically possible. Without more, it does not add to a conclusion that the intrusion could have been highly offensive.

### b. *Profit Motive*

Bogie's second factor, that the filming was motivated by profit, is resolved by sensitive attention to the statu-

tory language. Subsection (2)(b) includes the factor "for purposes of trade," which is tantamount to "for profit," while subsection (2)(a) does not contain equivalent language. We assume that where the legislature has intentionally included an element in one subsection of a statute, its exclusion in a different part of the statute is also intentional. See, *e.g.*, *Crandon v. United States*, 494 U.S. 152, 163-64 (1990) (where Congress used "unambiguous language" in other sections to cover preemployment payments, "the absence of comparable language in § 209(a) indicates that Congress did not intend to broaden the pre-existing coverage to that provision"); see also James J. Brudney & Corey Ditslear, *Canons of Construction & the Elusive Quest for Neutral Reasoning,* 58 Vand. L. Rev. 1, 12-13 (2005) (discussing appropriate application of the canons Whole Act Rule and *Expressio Unius* together to interpret the plain meaning of a statute). Since the legislature demonstrated the ability to make profit an explicit factor, we take the omission here to mean that it is not an element of the wrong.

Given the statutory language inviting development of the statutory interpretation under the common law of invasion of privacy, the difference in statutory language on "for purposes of trade" would not be conclusive by itself, but courts have recognized this intentional difference between invasion of privacy claims and misappropriation claims, refusing to collapse the two into one analysis:

> The "pecuniary gain" by PETA and its use of Berosini's celebrity for publicity and fund-raising purposes is not and cannot be, of the personal injury kind of tort

represented by the appropriation privacy tort. . . . If there were a "privacy" tort committed here by PETA, it would necessarily have to be a tort involving the right of publicity and *only* the right of publicity, and *not* the hurt-feelings, personal injury tort of appropriation.

*PETA v. Bobby Berosini, Ltd.*, 895 P.2d at 1284. The alleged lack of consent and the profit motive could not render the alleged intrusion highly offensive.

### c. *Content of Bogie's Statements*

The third alleged aspect of offensiveness originates in the substance of Bogie's own statements. She claims that capturing her comments to Rivers about deaf people was highly offensive. The argument runs up against concepts embedded in privacy law. The offensiveness of the intrusion itself cannot be based on the content or substance captured by virtue of the alleged intrusion. "The law of privacy is not intended for the protection of any shrinking soul who is abnormally sensitive about such publicity." William L. Prosser, *Privacy*, 48 Calif. L. Rev. 383, 397 (1960). Cf. 1 J. Thomas McCarthy, *The Rights of Publicity & Privacy* § 5:97 (2d ed. 2011) (explaining that videotaping is not an invasion of privacy simply because "the fact of the person's presence or actions at that public place is embarrassing to that person"). The fact that Bogie was embarrassed to be filmed saying something she regrets having said and now deems offensive does not convert the filming itself into a highly offensive intrusion. As the district court

explained, "§ 995.50 does not protect one from being associated with highly offensive material, but rather from a highly offensive intrusion on privacy." We therefore agree with the district court that the complaint and video show that Bogie cannot meet two essential elements of a section 995.50(2)(a) claim, and that leave to amend would be futile.

C. *Appropriation Claim*

Bogie also claims that defendants misappropriated her picture, without first obtaining consent, for "advertising purposes or for purposes of trade" in violation of Wis. Stat. § 995.50(2)(b) which is "aimed at preserving the individual's right of control over the commercial aspects of one's identity." *Gaiman v. McFarlane*, 2010 WL 897364, at *5 (W.D. Wis. Mar. 12, 2010). This claim fails as a matter of law because the documentary about Rivers is clearly subject to the newsworthiness exception for such claims. Additionally, we think it is clear as a matter of law that Bogie's image is merely incidental to the film, thereby barring her section 995.50(2)(b) claim. We turn now to the first exception.

1. *Newsworthiness or Public Interest Exception*

In Wisconsin, "where a matter of legitimate public interest is concerned, no cause of action for invasion of privacy will lie." *Van Straten v. Milwaukee Journal Newspaper-Publisher*, 151 Wis. 2d 905, 921 (Wis. App. 1989). Furthermore, the "question of newsworthiness is a ques-

tion of law to be determined by the courts." *Lemerond v. Twentieth Century Fox Film Corp.*, 2008 WL 918579, at *2 (S.D.N.Y. Mar. 31, 2008). The newsworthiness or public interest exception should be construed broadly, covering "not only descriptions of actual events, but also articles concerning political happenings, social trends or any subject of public interest." *Id.* (internal citations omitted). See also *De Gregorio v. CBS Inc.*, 123 Misc. 2d 491, 493 (N.Y. Sup. Ct. 1984) ("The scope of the subject matter which may be considered of 'public interest' or 'newsworthy' has been defined in most liberal and far-reaching terms."), quoting *Paulsen v. Personality Posters*, 59 Misc. 2d 444, 448 (N.Y. Sup. Ct. 1968) (dismissing comedian Pat Paulsen's claim based on unauthorized sale of posters based on satirical presidential campaign). In *Man v. Warner Bros. Inc.*, the court found that a movie depicting the Woodstock concert and festival was covered by the newsworthiness exception. 317 F. Supp. 50 (S.D.N.Y. 1970).

The complaint and video presented by Bogie herself make clear that the Rivers documentary is a matter of public interest and falls within this broadly drawn and inclusive category. One review explained: "The film offers a rare glimpse of the comedic process and the crazy mixture of self-doubt and anger that often fuels it. A unique look inside America's obsession with fame and celebrity." The review concluded: "Ultimately, Joan engenders strong feelings in people . . . they love her, they hate her . . . Joan's story is universal as it speaks to aging in a culture obsessed with youth, and exposes

the fleeting nature of fame by looking at the exception to the rule." Joint App. 28-29 (ellipses in original).[2]

*Lemerond* presented facts similar to this case. 2008 WL 918579, at *3 n.1. The plaintiff sued under New York Civil Rights Law § 51 (which is equivalent to Wis. Stat. § 995.50(2)(b)) alleging unlawful use of his image in the popular film *Borat*. The film includes a scene in which the fictional character Borat approached the (non-fictional) plaintiff on a street corner in New York City. Borat said, "Hello, nice to meet you. I'm new in town. My name a Borat." The plaintiff, "without further provocation, begins to run away in apparent terror, screaming 'Get away!' and 'What are you doing?'" *Id.* at *1. This objectively embarrassing clip of the plaintiff spanned thirteen seconds and was included in the film. Despite the inclusion of this objectively embarrassing clip, the district court dismissed the appropriation claim due to the fact that the film *Borat* was newsworthy and therefore exempt from the ambit of section 51. *Id.* at *3.

Similarly, the headlines segment in the *Tonight Show with Jay Leno*, which highlights pieces from the news

---

[2] While the district court's order did not address this possible exception in its entirety, the newsworthiness exception was fully briefed in the defendants' motion to dismiss and we therefore act within our discretion to "affirm on any ground that the record fairly supports and that appellee has not waived." *Burns v. Orthotek, Inc. Employees' Pension Plan & Trust*, 657 F.3d 571, 575 (7th Cir. 2011) (citation omitted).

that are humorous by virtue of their mistakes or embar-
rassing errors, was held newsworthy in *Walter v. NBC
Television Network Inc.*, 811 N.Y.S.2d 521, 523 (N.Y. App.
2006) ("A performance involving comedy and satire
may fall within the ambit of the newsworthiness
exception even if the performance is not related 'to a
legitimate news broadcast [or event].' ") (alteration in
original) (internal citations omitted). See also *Messenger v.
Gruner Jahr Printing & Publ'g*, 706 N.Y.S.2d 52, 57 (N.Y.
2000) (holding that no appropriation claim may
lie where "plaintiff's photograph is used to illustrate
a newsworthy article"). The public's interest in Rivers's
long career and fame in general clearly puts this case
on par (at least legally) with films about Woodstock and
the fictional Borat. The documentary therefore falls
safely within the bounds of the newsworthiness excep-
tion and thus the appropriation claim under sec-
tion 995.50(2)(b) fails as a matter of law.

### 2. *Incidental Use Exception*

The appropriation claim also fails for another, independ-
ent reason. At the time Wisconsin enacted section
995.50, New York law recognized the incidental use
exception. See, *e.g.*, *Moglen v. Varsity Pajamas Inc.*, 213
N.Y.S.2d 999, 1001 (N.Y. App. 1961) ("It has been
held that a mere incidental commercial use of a
person's name or photograph is not actionable under
the Civil Rights Law."). Wisconsin courts, heeding the
direction of section 3, therefore incorporated this
common law exception into the statute. See *Hagen v.*

*Dahmer*, 1995 WL 822644, at \*5 n.4 (E.D. Wis. Oct. 13, 1995)
("Even the incidental use of a name is insufficient to
constitute an invasion of the right to privacy. See *Ladany
v. William Morrow Co.,* 465 F. Supp. 870, 881 (S.D.N.Y.
1978) (construing sections 50 and 51 of the Civil Rights
Act, New York's right to privacy statute).").

For use of a person's name for advertising or
trade purposes to be actionable under Wisconsin law,
"there must be a substantial rather than an incidental
connection between the use and the defendant's com-
mercial purpose." *Stayart v. Yahoo! Inc.*, 2011 WL 3625242,
at \*2 (E.D. Wis. Aug. 17, 2011). In other words, there
must be a "direct and substantial connection between
the appearance of plaintiff's name or likeness and the
main purpose and subject of the work." *Netzer v.
Continuity Graphic Associates Inc.*, 963 F. Supp. 1308, 1326
(S.D.N.Y. 1997) (internal citation omitted).

Bogie argues, though, that the statute itself does not
include any exception for incidental appropriation of a
person's name or image for commercial purposes.
As explained above, the statutory language does not
limit the application of the exception in the way
Bogie claims since subsection 3 of the statute
mandates that it "shall be interpreted in accordance with
the developing common law."[3] Wisconsin lower courts

---

[3] Bogie questions the origin of the incidental use exception.
Judge Adelman, however, endorsed the exception in *Stayart
v. Yahoo! Inc.*, 2011 WL 3625242, at \*2 (E.D. Wis. Aug. 17, 2011),

(continued...)

have recognized this aspect of the statute and embraced its direction: "[B]ecause the legislature has expressly directed in § 995.50(3) that the statute be 'interpreted in accordance with the developing common law of privacy,'" that is "presumably something the legislature anticipated would ultimately be done by the supreme court." *Habush v. Cannon*, 2012 WL 2345137, at *1 (Wis. App. June 21, 2012), *cert. denied*, 822 N.W.2d 883 (Wis. 2012) (table).

The issue is whether we can decide as a matter of law whether the sixteen-second clip of Bogie in the Rivers documentary is incidental. Case law under New York and Wisconsin law provides strong support for the conclusion that the use here was minimal and thus incidental and can thus be decided as a matter of law. *Preston v. Martin Bregman Productions, Inc.* dismissed an intrusion of privacy claim based on the incidental use exception when a woman appeared in a motion picture for nine seconds in which she was portrayed as a prostitute. 765 F. Supp. 116, 119-20 (S.D.N.Y. 1991). See also *Candelaria v. Spurlock,* 2008 WL 2640471 (E.D.N.Y. July 3, 2008) (granting motion to dismiss based, in part, on incidental use exception where plaintiff appeared in *Supersize Me* documentary for three to four seconds

---

[3] (...continued)
citing the Endejan comment, 1978 Wis. L. Rev. 1029, 1047-48, which in turn cited New York and California decisions that are properly considered as part of the common law development of Wisconsin privacy law. We predict that the Wisconsin Supreme Court would adopt the incidental use exception and would find it applicable here.

captured by hidden camera). In *Man v. Warner Brothers*, a professional performer sued for invasion of privacy based on the inclusion of forty-five seconds of his stage performance at Woodstock. The court found, in part, that the forty-five second performance was "surely de minimus" and therefore incidental to the purpose of the film as a whole and thus also subject to the incidental use exception. 317 F. Supp. 50, 53 (S.D.N.Y. 1970).

There is no indication here that the exchange between Rivers and plaintiff Bogie was used to advertise the documentary film. If a forty-five second performance at Woodstock in a film about Woodstock was incidental — a case where the performer was supplementing and participating in the subject of the film — surely the district court was correct in finding that a sixteen-second clip of an autograph session in an eighty-two minute documentary about Joan Rivers was also incidental. Bogie's misappropriation claim therefore fails as a matter of law based on both the incidental use exception and the newsworthiness exception. Leave to amend could not avoid these exceptions, so dismissal with prejudice was appropriate. We affirm the district court's decision on this claim as well.

The judgment of the district court is AFFIRMED.