In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3207

ARIAN WADE,

*Plaintiff-Appellant,*

*v.*

JAMES COLLIER, JR., *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10-cv-06876 — **Virginia M. Kendall**, *Judge.*

ARGUED SEPTEMBER 18, 2014 — DECIDED APRIL 17, 2015

Before WOOD, *Chief Judge*, and POSNER and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Arian Wade, a former police officer for the Village of Maywood, was prosecuted in Illinois state court for criminal drug conspiracy. After a jury acquitted him, he sued three other Maywood police officers and the Village alleging violations of his federal equal protection rights and asserting a state law claim for malicious prosecution. The

district court granted the defendants summary judgment and Wade appeals. We affirm.

**I.**

On August 22, 2004, Hosie Thurman, a drug dealer and high-level gang member, attempted to bribe Maywood police officers Dwayne Wheeler, Weldon Cobos, and Theodore Yancy. Thurman offered to pay them between one and two thousand dollars a week in exchange for leaving his drug dealers alone. The officers did not accept Thurman's bribe and instead reported it to Maywood Police Chief James Collier, who, in turn, suggested they involve the Cook County State's Attorney's Office. Officer Wheeler contacted the State's Attorney's Office and informed them of Thurman's attempted bribe. The State's Attorney's Office also learned during the summer of 2004 that an individual arrested by Maywood police had told the officers that Thurman had some police officers on his payroll.

The State's Attorney's Office started an undercover operation dubbed Operation Pocket Change. They directed Officers Wheeler and Yancy to work undercover to gather evidence against Thurman and his associates. As part of this investigation, Officers Wheeler and Yancy pretended to be dirty cops and accepted from Thurman weekly payments of $1,200 in exchange for leaving his sellers (Torrance Coats and Harrison Collins, among others) alone.

The State's Attorney's Office obtained a warrant for a pen register[1] to monitor Thurman's cell phone. This information revealed numerous contacts between Thurman and Maywood Police Officer Arian Wade. The State's Attorney's Office then obtained authorization for a wiretap to record calls to and from Thurman's cell phone.

After learning that Wade was communicating with Thurman, the Operation Pocket Change team decided to "tickle the wire" to see if Wade would provide information to Thurman. In early December 2004, the Operation Pocket Change team agreed that Lieutenant Donald Mobley would announce during a roll call at which Wade was present that officers should stay clear of an area in which Thurman's dealers were known to engage in illegal activities. The area was near his grandmother's house. (This fact is important as will be seen shortly.)

The Operation Pocket Change team had not agreed on a specific date in December for the announcement to be made. However, on December 9, 2004, Officer Wheeler, as he explained in his deposition, told Officer Mobley by telephone to make the announcement that day. Officer Mobley testified he then went to the afternoon roll call, confirmed that Wade was present, and then told the officers to stay out of a certain area

---

[1] "A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the phone is released." *United States v. Hankton,* 432 F.3d 779, 782 n.5 (7th Cir. 2005) (internal quotation omitted). Typically, a pen register is "installed at a central telephone facility and records on a paper tape all numbers dialed from the line to which it is attached." *Id.* (internal quotation omitted).

of the city (which was part of Thurman's territory) because an outside law enforcement agency was conducting an operation there. Officer Mobley testified that after making the announcement, he called Officer Wheeler and informed him he had made the roll call announcement. Officer Mobley also told Chief Collier that he had done so. Chief Collier likewise testified that Officer Mobley had informed him of the roll call announcement, although at the time of his deposition (several years later), Chief Collier could not remember the date.

Maurice Macklin, an investigator for the State's Attorney's Office, testified that on December 9, 2004, one of the Maywood police officers had called the Operation Pocket Change wire room and informed the team that the roll call announcement had been made and that Wade was present for the announcement. At the time of his deposition, Investigator Macklin could not recall which officer had made the call. Officer Wheeler also testified in his deposition that Officer Mobley had called the wire room and told the Operation Pocket Change team that he had made the roll call announcement, although Officer Wheeler could not remember who took Officer Mobley's call.

Investigator Macklin testified that after he had learned that Officer Mobley had made the roll call announcement, he listened to the telephone calls intercepted from Thurman's cell phone and heard, real-time, Wade call Thurman and warn him that "Granny's house was hot."

Similarly, Assistant State's Attorney Catherine Hufford testified that while listening to the intercepted telephone calls she received word that Officer Mobley had made the roll call announcement, although Hufford did not remember which

investigator relayed this information to her. However, she remembered that after being informed that Officer Mobley had made the roll call announcement, the team waited to hear what calls would be made to Thurman's phone. Hufford further testified that later that same day, she heard the recording of Wade's call to Thurman in which he warned Thurman that an outside patrol was in the area and it was hot around Granny's house.

Wade admitted calling Thurman on December 9, 2004, after roll call and telling him "lot of people around grannys until about 7," and after Thurman said "say again," he repeated "a lot of people around grannys until about 7." Thurman then said "you say it's gonna be hot around grannys," and Wade said "yeah, it is already." Thurman then said "I'm a lay low then." After getting off the phone with Wade, Thurman called one of his sellers and told him that "over there by my granny's house it's suppose to be hot around the area. You be cool. You don't even really go over there."

Wade called and warned Thurman that Granny's house was hot about 90 minutes after Officer Mobley had called the wire room to inform the team that he had made the roll call announcement. Yet Wade claims that he did not hear the announcement. Rather, he claims he made up the tip in an attempt to garner favor with Thurman and eventually turn him into a confidential informant.

The investigators recorded many other calls between Wade and Thurman. Of particular significance was a call Wade made to Thurman on December 13, 2004. During this call, Wade informed Thurman that Coats (one of Thurman's sellers) had

"a problem." Thurman asked if Coats had been pulled over, and after some reluctance, Wade said "yeah," but that he did not know by whom. At the time of Wade's call, a surveillance team was operating in the area and noted that Wade had stopped down the block from where Coats had been pulled over. Wade called Thurman back a few minutes later and told Thurman that they had "got him" and were searching his vehicle. Thurman then asked Wade if it was someone local. After Wade said no, Thurman said, "so you can't do nothing," and Wade said "no." After hanging up, Thurman called Wade right back and asked if anyone was with Coats and Wade said he could not tell.

Following these exchanges, Assistant State's Attorney ("ASA") Daniel Reedy obtained a warrant for Wade's arrest, as well as a warrant to search his home. A search of Wade's home computer uncovered a fraudulent arrest warrant for Thurman. After Thurman was arrested, he told ASA Reedy that Wade helped him rob one of his suppliers by pretending to arrest him and seizing the supplier's drugs. Wade later gave those drugs to Thurman and also provided him with the fake warrant. Thurman testified at Wade's criminal trial that he (Thurman) later showed the warrant to his supplier to bolster the believability of his arrest. Officers recovered a hard copy of the fraudulent arrest warrant during the search of Thurman's home.

Later, the State's Attorney's Office obtained a grand jury indictment against Wade, Thurman, and some of Thurman's dealers for criminal drug conspiracy. Wade pleaded not guilty to the state criminal charges. Wade moved to suppress the evidence seized during the search of his home, arguing that the

search warrant application contained deliberate and material misrepresentations of fact. Specifically, Wade argued that the search warrant application falsely claimed that the roll call announcement was made on December 9, 2004.

In making this argument, Wade pointed to three different memoranda which purported to document the roll call announcement. One memo was dated December 15 and stated that the announcement had been made on December 13. The other two memos stated that the roll call announcement had been made on December 9, but one was dated December 9 and the other January 19, 2005. All three memos listed a different roster of police officers as those present during the roll call announcement, but all three memoranda listed Wade as being present during the announcement. Wade argued that these memos established that the announcement was made on December 13 and not December 9 and that the officers altered the memorandum to frame him. The state court denied Wade's motion based on testimony from the officers, and the case proceeded to trial. A jury later acquitted Wade.

After he was acquitted, Wade sued Officers Collier, Mobley, and Wheeler, as well as the Village of Maywood. He alleged a violation of his federal equal protection rights and a state malicious prosecution claim. The gist of his lawsuit is that the defendants lied to the State's Attorney's Office about making the roll call announcement on December 9, 2004, and that this lie caused his wrongful prosecution (and also caused him to be treated differently than other officers who communicated with drug dealers). The district court granted the defendants' motion for summary judgment and Wade appeals.

## II.

### A. Malicious Prosecution

We begin with Wade's malicious prosecution claim. Under Illinois law, to state a malicious prosecution claim, Wade must show "(1) the commencement or continuation of an original criminal or civil proceeding by the defendants; (2) termination of the proceeding in his favor; (3) the absence of probable cause; (4) the presence of malice on the defendants' part; and (5) damages." *Swearnigen-El v. Cook County Sheriff's Dept.*, 602 F.3d 852, 863 (7th Cir. 2010). It is well established that the existence of probable cause forms a complete defense to a malicious prosecution claim. *Logan v. Caterpillar*, 246 F.3d 912, 926 (7th Cir. 2001). Further, "[u]nder Illinois law, a grand jury indictment is *prima facie* evidence of probable cause." *Swearnigen-El*, 602 F.3d at 863.

In this case, the grand jury indictment of Wade is prima facie evidence of probable cause. *Id.* Wade argues the grand jury indictment does not establish probable cause because the defendants lied to the State's Attorney's Office about announcing on December 9, 2004, during the roll call that officers should stay clear of Thurman's territory. Wade maintains that the grand jury's indictment was based on that false information and thus the indictment does not establish probable cause. *See Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286, 289 (Ill. 1965) (noting that a grand jury's presumption of probable cause "may be rebutted by other evidence, such as proof that the indictment was obtained by false or fraudulent testimony before the grand jury … or other improper or fraudulent

means"); *see also Fabiano v. City of Palos Hills,* 784 N.E.2d 258, 276 (Ill.App. 2002).

Wade's argument fails for two reasons. First, the evidence, read in the light most favorable to Wade, does not establish a genuine issue of material fact concerning his assertion that the defendants lied about Mobley making the roll call announcement on December 9. Wade claims that a factual issue exists concerning the date of the announcement based on the memorandum dated December 15, which stated that the roll call announcement had been made on December 13. Wade seems to argue that since the defendants had access to the recordings from the wire tap, after hearing the content of his December 9 call to Thurman, they conspired to falsely claim that Mobley's roll call announcement had been made on December 9. Wade's theory is that while he had called Thurman on December 9 and told him to stay clear of Granny's house, he did not get that information from any roll call announcement, but merely made it up in an attempt to gain Thurman's confidence and thereby turn him into an informant. And, Wade continues, the defendants' lie and the alteration of the memorandum to state that the roll call announcement had been made on December 9 made his innocent police work seem "nefarious." Appellee's Reply Brief 6.

Lieutenant Mobley testified that the December 13 date contained in the memoranda was a mistake. Under other circumstances, the conflicting memoranda might create a genuine issue of material fact, but they do not in this case. Investigator Macklin and ASA Hufford both testified that on December 9, the team was told that the roll call announcement had been made and that Wade was present for the announce-

ment. About ninety minutes later, Investigator Macklin and ASA Hufford heard Wade's call to Thurman wherein he passed on the warning to Thurman. Wade does not claim that anyone from the State's Attorney's Office was part of the alleged conspiracy, nor is there any evidence to call into question their testimony. Of course, the State's Attorney's Office's staff were not in the roll call room when the announcement was made, but Wade's theory is metaphysically impossible. Under Wade's theory, it was *after* hearing his December 9 call to Thurman that the defendants decided to frame Wade by telling the State's Attorney's Office that the roll call announcement had been made on December 9, thereby making his tip to Thurman look nefarious. But Mobley called the wire room on December 9 to inform the Operation Pocket Change team that he had made the roll call announcement *before* Wade called Thurman, and thus before the defendants could possibly have heard the warning call. Under these circumstances, the disparity in the memoranda does not create a genuine issue of material fact concerning the date of the roll call announcement.[2]

---

[2] Wade also suggests in passing that Officer Mobley never made an announcement at roll call directing officers to stay out of Thurman's territory. But he offers no evidence to support such a theory. In his own affidavit he merely claims that while in the December 9 "roll call, I did not hear Officer Mobley state that there was an outside agency conducting an operation in the area of 100 block of 10th and 11th Ave." He also attested: "I was present at the December 13, 2004 roll call. I have never paid attention to whether Commander Mobley made a statement regarding police activity." Conversely, in addition to their own testimony, the defendants presented evidence from another officer (one not involved in Operation

(continued...)

Moreover, even if we disregard the grand jury indictment and the evidence concerning the roll call announcement, including Wade's subsequent call to Thurman, the remaining evidence established probable cause to charge Wade. Probable cause is a complete bar to a malicious prosecution claim. *Logan*, 246 F.3d at 926. Probable cause is merely the "probability or substantial chance [that] criminal activity exists; it does not require the existence of criminal activity to be more likely true than not true." *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012). And "[t]his is an objective inquiry; we do not consider the subjective motivations of the officer." *Id.* at 247.

In this case, there was substantial evidence that Wade conspired with Thurman. The State's Attorney's Office had evidence that Thurman attempted to bribe three Maywood police officers and already had other Maywood officers on his payroll. The pen register run by the State's Attorney's Office showed extensive contacts between Wade and Thurman and the wire tap recorded multiple conversations between Wade and Thurman, including several calls where they arranged to meet in person, one call in which Thurman asked Wade to help him purchase a bullet-proof vest, and another call in which Wade warned Thurman that Coats had been pulled over and was having his car searched. This last call was particularly damning because Wade told Thurman he did not know the

---

[2] (...continued)
Pocket Change) that Officer Mobley came into roll call and instructed the shift to stay out of a specific area. While that officer could not remember the date the announcement was made, his testimony confirms that such an announcement was made and the other evidence establishes that the announcement was made on December 9.

officers involved and therefore could not do anything about it. Additionally, the Operation Pocket Change team discovered no contacts between Thurman and other Maywood police officers, other than the extensive contacts between Wade and Thurman (and Thurman and the undercover officers). Taken together, this evidence established a "substantial chance" that Wade was involved in a criminal conspiracy with Thurman. *Thayer*, 705 F.3d at 246.

Finally, there was the fraudulent warrant for Thurman's arrest discovered on Wade's computer and in Thurman's home. This fraudulent warrant corroborated Thurman's claim that Wade had helped him rob one of his suppliers by pretending to arrest Thurman and that Wade gave him the faux warrant to bolster the legitimacy of his arrest in the eyes of his supplier. Because there was probable cause to charge Wade, and even more evidence to continue to prosecute him, the district court properly granted the defendants summary judgment on his malicious prosecution claim.[3]

**B. Class-Of-One Equal Protection Claim**

Wade also presented a class-of-one equal protection claim under 42 U.S.C. § 1983. There are two main problems with Wade's equal protection claim. First, Wade's equal protection claim is merely a reframing of his malicious prosecution claim.

---

[3] The defendants argue extensively on appeal that they, as police officers, could not be liable for malicious prosecution because the prosecutors were the ones who decided to charge Wade. However, because probable cause supported the charging of Wade, there is no need for us to decide whether the defendants' conduct was sufficient to constitute "the commencement or continuation of the criminal claim." *Swearnigen-El*, 602 F.3d at 863.

Wade claims the defendants treated him differently from other officers who communicated with known drug dealers in that he was charged criminally and they were not. Where an equal protection claim is merely a rewording of a malicious prosecution claim, dismissal of the equal protection claim is appropriate. *See Vukadinovich v. Bartels*, 853 F.2d 1387, 1391–92 (7th Cir. 1988).

Second, Wade cannot show "that the defendants intentionally treated [him] differently from others similarly situated to [him] for no other reason." *Williamson v. Curran*, 714 F.3d 432, 449 (7th Cir. 2013).[4] "The persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in all material respects." *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010). None of the individuals Wade points to was similarly situated. For instance, he first argues that Officers Yancy and Wheeler were similarly situated "because they provided inside information to Hosie Thurman and were not the subject of a criminal prosecution." Appellant's Brief at 26. But Officers Yancy and Wheeler were working undercover and hand-in-hand with the State's Attorney's Office in connection with Operation Pocket Change and provided the information to Thurman *as part of* the investigation. Next, Wade points to Maywood Police Officer Valerie Hastings as someone he believes is similarly situated

---

[4]   In this circuit there is a split concerning whether a plaintiff must also prove animus or improper motive for class-of-one claims. *See Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc).  However, we need not reach that issue in this case because Wade's equal protection claim fails for other reasons.

but treated differently. Wade claims that Hastings had also given information to a drug dealer but that rather than being prosecuted, she was merely fired. There are two problems with Wade's reliance on Hastings as a comparator. First, Wade does not support his argument concerning Hastings with record evidence. Before the district court, Wade attempted to file redacted documents discussing Hastings's situation, but the district court ordered him to file the original, unredacted documents. Wade did not file those documents, but instead provided the court with "courtesy copies." Because he did not file the documents with the district court, they never became part of the record and this court denied Wade's motion to supplement the record on appeal. Second, Wade's own description of Hastings's situation distinguishes her case from Wade's. Wade claims that Hastings provided information to a drug dealer named Brian Daviston. The district court found Hastings's situation different because her call to Daviston had not been recorded. That is true but there is an even more material difference: There was evidence that Thurman already had police officers on his payroll and at the time that Wade disclosed information to Thurman, the State's Attorney's Office was undertaking a criminal investigation to discover the identity of the corrupt cops. Wade does not claim that Daviston, like Thurman, had police officers on his payroll and that the State's Attorney's Office was involved in the investigation at the time Hastings purportedly passed on the information. All of these differences render Hastings not comparable to Wade. Finally, Wade claims that Officer Wheeler treated officers involved in an earlier (June 2006) undercover operation, dubbed "Operation Double Trouble," more favorably by

not seeking criminal prosecution of any officers who had contacted narcotics dealers during the course of that under-cover operation. But Wade does not point to any specific officer who was treated differently and instead merely claims the "Appellees failed to disprove" that other officers had not contacted drug dealers during Operation Double Trouble. Appellant's Brief at 28. However, it is Wade and not the defendants who bears the burden of proof and to survive summary judgment, Wade must identify an individual who was similarly situated but treated differently, without a rational reason. *See Fares Pawn, LLC v. Indiana Dept. of Fin. Instit.*, 755 F.3d 839, 845 (7th Cir. 2014). He has not done so. Accordingly, the district court properly granted the defendants summary judgment on Wade's class-of-one equal protection claim.[5]

One loose end before closing. Throughout this discussion we have referred to the defendants jointly because Wade's

---

[5] Wade's class-of-one equal protection claim likely also could not withstand the logic of *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008). In *Engquist*, "the Supreme Court held that public employees cannot bring class-of-one claims against their public employers because the theory is 'simply a poor fit' in the employment context, which necessarily 'involve[s] discretionary decisionmaking based on a vast array of subjective, individu-alized assessments.'" *Fares Pawn*, 755 F.3d at 848 (quoting *Engquist*, 553 U.S. at 603, 605). In *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008), we applied *Engquist*'s logic to reject a class-of-one equal protection claim based on the government actor's exercise of prosecutorial discretion. Similarly, Wade's class-of-one equal protection claim is not a good fit in the context of a harm caused by the State's Attorney's Office's exercise of its prosecuto-rial discretion. *But see Hanes v. Zurick*, 578 F.3d 491, 495 (7th Cir. 2009).

malicious prosecution and equal protection claims cannot succeed. But, in reality, Mobley was the sole defendant responsible for making the roll call announcement and it was Mobley who informed the other defendants that he had done so. Had Wade presented sufficient evidence that Mobley had lied about making the roll call announcement, Wade would still need to establish a basis for holding Officers Collier and Wheeler, as well as the City of Maywood, liable. However, because there is no basis for liability for anyone, we did not explore this issue.

### III. Conclusion

The district court properly granted the defendants summary judgment on Wade's claims. Wade's malicious prosecution claim fails because probable cause supported his prosecution. Wade cannot succeed by merely reframing that claim as a class-of-one equal protection claim. Nor is an equal protection claim well-suited to a case involving prosecutorial discretion, such as this one. Added to these defects is Wade's failure to identify a similarly-situated individual who was treated more favorably. For these and the foregoing reasons, we AFFIRM.