In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1742

CHRISTOPHER COLEMAN,

*Plaintiff-Appellant,*

*v.*

CITY OF PEORIA, ILLINOIS, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:15-cv-01100-SLD-TSH — **Sara Darrow**, *Chief Judge.*

ARGUED FEBRUARY 22, 2019 — DECIDED MAY 24, 2019

Before RIPPLE, MANION, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Almost twenty-five years ago, a jury convicted Christopher Coleman of armed robbery, home invasion, residential burglary, and aggravated sexual assault. Three witnesses linked Coleman to the crimes, and their identifications were the key evidence leading to his conviction. The court sentenced Coleman to sixty years' imprisonment.

Fifteen years later, a group of men came forward claiming they were responsible for the crimes. Based on this new evidence, the Illinois Supreme Court ultimately vacated Coleman's convictions and remanded for retrial. *People v. Coleman*, 996 N.E.2d 617 (Ill. 2013). Rather than retry the case, the prosecution decided to drop it. After nineteen years behind bars, Coleman was released in 2013, and a later judicial order certified his innocence.

Coleman has now sued the City of Peoria and four police officers—Patrick Rabe,[1] Terry Pyatt, Timothy Anderson, and Michael Ford—accusing them of constitutional violations and state torts. Specifically, Coleman contends defendants elicited a false statement from an alleged accomplice through coercive interrogation techniques, employed improper and unduly suggestive identification procedures, and suppressed impeachment evidence. After three years of civil litigation, the district court granted defendants summary judgment on Coleman's federal claims and state law malicious prosecution claim, and it relinquished supplemental jurisdiction over his remaining state law claims.

We agree with the district court's summary judgment decision and affirm. Coleman failed to present evidence supporting a reasonable inference that defendants knowingly fabricated false evidence, caused unreliable eyewitness identifications to taint his criminal trial, withheld material evidence, or arrested him without probable cause.

---

[1] Rabe passed away after the filing of this lawsuit, and his estate was substituted in his place.

**I. Background**

The parties agree on many basic facts, but they vigorously dispute a few key points and the inferences to be drawn from undisputed evidence. Because this appeal comes to us on summary judgment, we review all evidence in the light most favorable to Coleman and give him the benefit of all reasonable inferences. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016).

*A. The Home Invasions*

During August 1994, the Peoria Police Department investigated a series of home invasions with a similar modus operandi. The early morning hours of August 22 were especially busy.

At approximately 2:10 a.m., Officer Douglas Theobald responded to a 911 call from Yolanda Buckley reporting a violent burglary. Buckley told the police that four men forced their way into her house, placed a pillowcase over her head, struck her with a gun, and ransacked her home, stealing money, a bike, and a stereo. She also claimed to have overheard her attackers discussing what to do next.

About thirty minutes later, a group of men broke into Bertha Miller's house, less than a half mile from Buckley's. Bertha lived with two of her sisters and her twin teenage daughters, Tequilla Miller and Tekelia Miller. The burglars entered via the kitchen window, wore bandanas over their faces, demanded money and drugs, and tore up the home looking for valuables to steal. They threatened the residents with handguns drawn, repeatedly hitting and kicking their victims. One of the invaders dragged Tekelia into a bathroom and raped her at gunpoint, within earshot of Bertha.

Eventually, one of Bertha's sisters reached a telephone upstairs and dialed 911. The first police officers arrived at approximately 3:10 a.m. A pre-teen boy acting as the criminals' lookout alerted them to the officers' arrival. Two men raced out the front door with the boy, while the rest retreated to the second story before jumping out a window one by one. The police apprehended Robert Nixon inside the house and James Coats after he jumped out the window, but the others escaped the scene.

### B. Police Investigation

Detective Patrick Rabe arrived shortly after the first responding officers, at around 3:15 a.m. Rabe led the investigation into the Miller home invasion, which the police conducted separately from the investigation into the Buckley burglary.

While the events at the Miller home were unfolding,[2] Officer Theobald drove to the Warner Homes, a public housing development about five blocks away known for drug and gang-related activity. There, he arrested Coleman in connection with the Buckley crimes.[3] Theobald failed to record Coleman's time of arrest in his report, contrary to department protocol.

Rabe took the Millers to the police station shortly after 4:00 a.m. Officers conducted witness interviews but did not

---

[2] As discussed below, the parties disagree about the exact sequence.

[3] Defendants claim the police arrested Coleman based on a Crime Stoppers tip that reported "Chris Coleman" was carrying a stereo into the Warner Homes. Coleman disputes the existence of the tip. The dispute is not material to defendants' summary judgment motion.

show the victims any photographs or lineups during this early morning visit. Tequilla Miller told officers she recognized the perpetrators from her time living in the Warner Homes.

As Tequilla exited the station to go home, officers were escorting Coleman and Nixon down the same hallway. Seeing the two men (and in the presence of an unnamed officer), Tequilla announced, "Well, there goes two of them dudes that was at our house." Rabe was not in the hallway during the encounter, but Tequilla told him about it later that day.

Tequilla returned to the station around noon. Based on her earlier statement that she recognized the perpetrators from the Warner Homes, Rabe asked Sergeant Michael Ford and Officer Timothy Anderson for assistance. Ford and Anderson both worked a beat around the Warner Homes, and they offered names of possible suspects as Tequilla described the burglars. Rabe then showed Tequilla pictures of over one hundred possible offenders on a computer screen, as well as a stack of photographs of juveniles who officers suspected might have been the lookout she described.[4] Tequilla picked

---

[4] Coleman's assertion that officers showed "Tequilla a single photograph of Plaintiff and no one else, not as a part of a lineup or book of mugshots," Appellant's Br. 9, *Coleman v. City of Peoria*, No. 18-1742 (7th Cir. Sept. 14, 2018), ECF No. 24, is misleading. Rabe testified he performed a computerized "cold search" of photos of arrestees in Peoria County who matched the age, weight, and height description Tequilla provided. Tequilla said Rabe showed her more than one hundred such photos. Although the photos were not arranged in an array, this is not a case where police put a single photo in front of a witness and asked her to confirm that person was the perpetrator.

out Coleman as one of the burglars and identified a 12-year-old boy named Anthony Brooks as the lookout.

Officers brought Brooks down to the station later that afternoon, and Rabe questioned him without an attorney or parent present. Brooks initially denied any involvement with the Miller home invasion. Rabe told Brooks he did not believe him, informed Brooks that a witness had already identified him, showed him a photograph of Coleman, and told Brooks he would spend the rest of his life in prison and never see his family again if he did not incriminate Coleman.[5] Eventually, Brooks confessed to committing the crimes with Coleman and four other individuals.

Shortly thereafter, Tequilla Miller returned to the police station for the third time that day, where she viewed a four-person lineup. Officers told Tequilla, "We are not going to tell you who to pick. … Go in there and just pick out whoever you saw in the photos, you know, if those are the people. … One of these people is the person you picked out in the photo, the rest are volunteers. … Pick out the person that you think was the one." Coleman was in the lineup, as were three inmates from the Peoria County Jail who each wore identical yellow wristbands. Coleman did not wear such a wristband. Tequilla identified Coleman as one of her assailants.

### C. Grand Jury Testimony

On September 13, 1994, a grand jury convened to decide whether to indict Coleman. Bertha Miller took the stand to describe the crimes to the grand jury. When asked if she knew

---

[5] Although Rabe denied Brooks's description of the interrogation on multiple occasions before his death, at this stage we take the facts in the light most favorable to Coleman.

any of the burglars, Bertha testified, "I know Chris Coleman from a little kid, but I didn't know at the time that was him." Tequilla Miller stated she recognized one of the men, who she named as "Robert Nickerson"—Tequilla did not mention Coleman. Anthony Brooks did not testify before the grand jury.

Rabe did testify, summarizing how Coleman was identified and arrested:

> We later, through photographs and speaking with other police officers who were familiar with these guys, came up with the names of Chris Coleman, Elbert Nickerson, one still at large by the name of Roberson …, and a juvenile by the name of Anthony Brooks. What we did was put together photograph line-ups of these subjects. We showed 'em to the Millers, they were identified.

> We went out, we arrested them. We brought them in and we placed them in an in-person line-up with black males of similar age, height, and weight. Coats, Nixon, Coleman, Nickerson, were all positively identified in those line-ups as being the subjects who had broken into their house and robbed them on that evening.

The grand jury indicted Coleman on all charged counts.

### D. Pre-Trial Proceedings

Two weeks later, Anthony Brooks returned to the police station to recant, denying that he or Coleman had been at the Millers' house on August 22. Months later, Coleman's fiancée reported that, on the night of the crimes, Coleman had been

with her at a friend's apartment continuously from 10:30 p.m. until the time of his arrest.

Officers photographed the members of the live lineup shown to Tequilla Miller shortly after she identified Coleman. The photo shows Coleman lacked a yellow wristband like the others wore. The prosecution's case file does not contain a copy of that photo, and neither the assistant state's attorney nor Coleman's defense counsel recalls seeing it before trial. Years later, the photo was found in a case file on another home burglary that police officers investigated around the same time.

The day before Coleman's criminal trial, defense counsel moved to suppress Tequilla's photo and lineup identifications based on the early morning hallway encounter. During the suppression hearing, Tequilla identified Coleman as one of the burglars. She testified she saw his face for a "good three minutes" during the incident. Tequilla told the court she made her earlier identifications of Coleman because she recognized his face; she said officers never told her who to pick out. The court denied Coleman's motion to suppress.

### E. Criminal Trial

Coleman's three-day criminal trial began on April 4, 1995. Tequilla Miller, the prosecution's first key witness, testified she awoke to noise in the early morning hours of August 22 and rushed into the living room, where she found men standing over her aunt with guns drawn. She told the jury how the intruders threw her to the floor and unsuccessfully attempted to cover her head with a pillowcase. Tequilla said two men took off the bandanas covering their faces during the incident. She claimed she recognized one as "Fats," an acquaintance

from when her family lived in the Warner Homes.[6] Tequilla identified that man as Coleman and testified she observed him for a "good three minutes" during the home invasion. She noted that Coleman had sat in a chair next to a lamp "most of the time" during the burglary and that she had no problem seeing his "whole face."

Tequilla testified Rabe showed her more than one hundred photos of possible suspects when she went to the police station around noon. As for the lineup, Tequilla acknowledged police officers informed her that some of the men were "volunteers" and others "were people that I named out [from photos]." But Tequilla stated this had no influence on her lineup identification of Coleman. Tequilla explained she picked Coleman because she "remember[ed] his face from that night" and that she remembered his face because she knew him previously.

Defense counsel never objected to Tequilla's in-court identification of Coleman. Cross-examination, however, highlighted that Tequilla had not told the grand jury that she recognized Coleman and that she had retracted her identification of Elbert Nickerson (the one man she told the grand jury she had recognized). On redirect, Tequilla testified she was "positive" she saw Coleman's face during the attack.

After Tequilla's testimony, Bertha Miller took the stand. Despite admitting she could not see Coleman's face during the burglary, Bertha identified him as one of the perpetrators by his voice and "crooked" limp. She explained that she had been friends with Coleman's mother when he was a child, that

---

[6] Later in the trial, Coleman acknowledged he recognized Tequilla from the Warner Homes.

he had visited her home regularly back then, and that she had
known him for "[a]bout 19 or 20 years."

On cross, Bertha vociferously reaffirmed her identification
of Coleman:

> I'm saying the person that I know was Chris
> Coleman—You understand me, [defense coun-
> sel], he was there. Do you understand what I am
> saying? I know him. Can nobody doubt me that
> I would know him. Thank you, sir. I know that
> he was there. … He was there in the dining
> room, there to my bedroom door, there while I
> had my face turned this way, and when they
> started beat, and when they started kicked, and
> went on, and Chris Coleman was standing there
> giving orders. Do you understand me, sir? … I
> know that from his voice, and I know that from
> his walk. I was not blind. … I know his voice
> from being an individual; I know his voice from
> being an adult, too. I seen Chris Coleman a lot
> of time. I don't associate with him because I
> have no right. He's a kid to me, but I know Chris
> Coleman. Don't I, Chris? I know.[7]

Next, the prosecution called its third identification wit-
ness, Anthony Brooks. Brooks provided confusing—and
seemingly contradictory—testimony on whether Coleman

---

[7] Coleman later admitted he knew Bertha from the Warner Homes,
but he disputed her portrayal of their relationship.

participated in the Miller home invasion.[8] When asked on direct, Brooks testified Coleman was at the Millers' home during the early morning hours of August 22. But when probed on cross, Brooks said Coleman was not there and the only reason he ever identified Coleman was Rabe's threat that he would never see his family again.

The defense called Robert Nixon, who was apprehended at the scene and pleaded guilty. Nixon stated Coleman did not participate in the crimes. He identified five other men as his accomplices.

Coleman testified on his own behalf, claiming he had been at the apartment in the Warner Homes all night before his arrest and denying any involvement with the Miller home invasion. Coleman's fiancée and a friend both corroborated his alibi.

Following closing arguments, the jury found Coleman guilty on all four counts.

### F. Post-Conviction Proceedings

Coleman moved for a new trial, which the trial court denied. The Illinois Appellate Court affirmed his conviction,

---

[8] Much of the confusion involved Brooks's testimony that Coleman shared the nickname "Fats" with one of the other alleged perpetrators: "Q: At that time, did you or did you not tell Detective Pat Rabe that Christopher Coleman was with you on the morning of August 22, 1994? A: There was two Fats on that day when [Rabe] showed me [photographs]. Q: Pardon me? A: They had two dudes. Both of them name was Fats on that paper, a light skin one and a dark skin one. Q: Which Fats did you tell him that was with you on the morning of August 22, 1994? A: Told both of them. Q: Both of them. Well, who is the dark skin Fats that you told Officer Rabe that was with you? A: But it was the light skin one."

*People v. Coleman*, 718 N.E.2d 1095 (Ill. App. Ct. 1997) (unpublished table decision), and the Illinois Supreme Court denied further review. *People v. Coleman*, 690 N.E.2d 1383 (Ill. 1998) (unpublished table decision).

Coleman then filed a petition for post-conviction relief, alleging ineffective assistance by his appellate counsel in failing to challenge the admission of Tequilla Miller's photo and lineup identifications. The Illinois Appellate Court denied Coleman's petition, noting "Tequilla Miller's credibility was thoroughly tested at trial, and the jury apparently believed her." Order 4, *People v. Coleman*, No. 3-99-0414 (Ill. App. Ct. Mar. 16, 2001).

Eight years later (about 14 years after Coleman's conviction), Coleman filed a motion for leave to pursue a successive petition for post-conviction relief on the basis of actual innocence. In support, Coleman submitted affidavits and testimony from several individuals, including all six men identified as the perpetrators by Robert Nixon at Coleman's trial. Five of the men claimed personal responsibility for the crimes, and all six stated Coleman was not involved.

The trial court denied Coleman's petition, and the Illinois Appellate Court affirmed that decision. *People v. Coleman*, No. 3-10-0419, 2011 WL 10468157 (Ill. App. Ct. Aug. 25, 2011). But the Illinois Supreme Court reversed, granting Coleman's post-conviction petition based on this new evidence, vacating Coleman's convictions, and remanding for another trial. *People v. Coleman*, 996 N.E.2d 617, 621, 641 (Ill. 2013) ("Weighed against the State's evidence, the defendant's new evidence is conclusive enough that another trier of fact would probably reach a different result.").

Approximately six months later, rather than retry the case, the prosecution moved to dismiss it. The state's attorney's office later said it did so because of Bertha Miller's death in the intervening years, which made "proof beyond a reasonable doubt difficult," and because Coleman had already served "as much time incarcerated as other perpetrators of the applicable crimes."

Coleman was released from prison after the criminal prosecution was dropped, and he filed a petition for a certificate of innocence.[9] The circuit court for Peoria County granted Coleman a certificate of innocence in 2015.

### G. *This Litigation*

Coleman filed this lawsuit in federal court five days later. His operative complaint alleges nine counts. The first four are brought under 42 U.S.C. § 1983: violation of his due process right to a fair trial under the Fourteenth Amendment, conspiracy to deprive him of his constitutional rights, failure to intervene, and violation of his Fourth Amendment rights through detention without probable cause. The last five counts are related state law claims: malicious prosecution, intentional infliction of emotional distress, civil conspiracy, respondeat superior, and indemnification.

Defendants eventually moved for summary judgment. The district court granted the motion, entering a judgment on

---

[9] If an Illinois conviction is reversed or vacated, the previously convicted individual may petition for a "certificate of innocence." 735 ILL. COMP. STAT. 5/2-702(b) (2014). If granted, such a certificate constitutes a judicial "finding that the petitioner was innocent of all offenses for which he or she was incarcerated" and sets in motion a process to expunge the matter from the petitioner's record. 735 ILL. COMP. STAT. 5/2-702(h) (2014).

the merits with respect to Coleman's § 1983 and malicious prosecution claims, while declining supplemental jurisdiction over his remaining state law claims and dismissing them without prejudice. Coleman now appeals that decision.

## II. Discussion

### A. Due Process Claim

We begin with Coleman's claim that defendants violated the Fourteenth Amendment's Due Process Clause by depriving him of a fair trial. Coleman presents three distinct theories for this claim: (1) defendants fabricated evidence by coercing a false statement from Brooks; (2) defendants used unduly suggestive procedures that tainted Tequilla's identifications; and (3) defendants violated their *Brady* obligations by withholding the lineup photo.

As explained below, the summary judgment record does not present a genuine issue of material fact on any of Coleman's due process theories, and defendants are entitled to judgment as a matter of law on each.

#### 1. The evidence is insufficient to reasonably infer that defendants fabricated Brooks's statement.

Coleman's primary contention is that Rabe fabricated Brooks's incriminating statement. Obviously, law enforcement officers "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Using false evidence to convict violates a defendant's right to a fair trial guaranteed by the Fourteenth Amendment's Due Process Clause. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *see also Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).

This is a high bar to clear. Coleman must prove not only that Brooks's statement was false but that Rabe "manufactured" it. *Whitlock*, 682 F.3d at 580. That requires proof that Rabe caused Brooks to provide him with a statement that Rabe knew—with certainty—was false. *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) (investigators fabricate evidence when they tell "witnesses what to say knowing that what the team [is] telling them [is] false"). Evidence that merely impeaches aspects of Brooks's statement or suggests Rabe had reason to doubt Brooks's veracity is insufficient.

Coleman raises three arguments to prove Rabe knew Brooks's statement was false, each depending on inferences from circumstantial evidence. Although Coleman is entitled to have all reasonable inferences drawn in his favor at this stage, "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Carmody v. Bd. of Tr. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018).

First, Coleman points out that Rabe led the investigation into the Miller home invasion. From that undisputed fact, Coleman contends a jury could reasonably infer that Rabe knew the specific time of Coleman's initial arrest. And from there, Coleman suggests the jury could divine that Rabe knew it was impossible for Coleman to have been involved in the Miller home invasion because he was already in police custody. Coleman starts with the simple fact that Rabe led an investigation, and he ends up with a conclusion that Rabe must have known Coleman had a slam dunk alibi but manufactured false evidence to prosecute him anyway.

Such an inference is entirely speculative. No testimony suggests Rabe knew the time of Coleman's arrest.[10] Police officers initially arrested Coleman in connection with the Buckley home invasion; Rabe was not responsible for investigating that separate crime. And the lack of a time of arrest in Officer Theobald's police report does not establish Rabe knew exactly when Coleman was arrested. It was Coleman's obligation to present evidence of Rabe's knowledge, not defendants' burden to disprove Coleman's hypotheses. *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010) (noting it is a § 1983 plaintiff's burden to establish the underlying constitutional deprivation).[11]

---

[10] Coleman points to testimony from two responding officers acknowledging they discussed the basic fact that two home invasions occurred on the same night, arguing this demonstrates Rabe would have learned about Coleman's time of arrest from the Buckley investigators. But the officers' testimony does not support the conclusion that the police teams shared specific details about developments in the separate investigations. Nothing in the record suggests officers discussed the exact time of Coleman's arrest, let alone that such information was conveyed to Rabe.

[11] Even assuming Coleman presented evidence supporting this initial inference that Rabe knew when Coleman was arrested, Coleman lacks any evidence for his secondary inference that Rabe must have connected all the dots and realized that—based on the time of arrest—Coleman could not have been involved with the Miller home invasion and Brooks's statement was certainly false. Tequilla Miller testified that two offenders escaped with the lookout before officers broke up the burglary. Officer Theobald arrested Coleman just five blocks away. Under Coleman's own reconstructed timeline, it would have been possible for him to have engaged in the crimes, fled the scene to the Warner Homes, and have arrived in time to be arrested by Officer Theobald. That Coleman's own reconstructed timeline allows for this possibility defeats any reasonable inference that Rabe must have ruled it out with certainty that day.

Second, Coleman notes that a report Rabe prepared indicates he "arrested" Coleman (who was already in police custody) for the Miller home invasion at 1:10 p.m., about three hours before he interrogated Brooks. Coleman claims this supports a reasonable inference that Rabe decided to frame Coleman for the crime first and then went to work manufacturing evidence to convict. This overlooks that Tequilla Miller identified Coleman by his photo before 1:00 p.m. It is not reasonable to infer Rabe must have falsified Brooks's statement to justify Coleman's arrest when he already possessed an eyewitness identification. *Cf. Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) (an identification by a single eyewitness can support probable cause for arrest).

Third, Coleman argues Rabe must have known Brooks's statement was false because he coerced Brooks and supplied him with details about the crime in his questioning. But the fact Rabe applied coercive interrogation techniques is insufficient to find fabrication of evidence. *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) ("[A] claim that an officer coerced a witness to give incriminating evidence does not, at least standing alone, violate the wrongly convicted person's due-process rights."). Coerced testimony is not necessarily fabricated. A reluctant witness or co-conspirator whose testimony an officer must pry out through aggressive interrogation techniques may be telling the truth despite the measures used. Fabricated testimony, meanwhile, is invariably false because it is made up by the officer, who knows he is making it up. *Fields*, 740 F.3d at 1110.

We explained this distinction in *Whitlock*:

> Coercively interrogating witnesses, paying witnesses for testimony, and witness-shopping

> may be deplorable, and these tactics may con-
> tribute to wrongful convictions, but they do not
> necessarily add up to a constitutional violation
> even when their fruits are introduced at trial.
> Evidence collected with these kinds of suspect
> techniques, unlike falsified evidence and per-
> jured testimony, may turn out to be true.

682 F.3d at 584. We reaffirmed that point in *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014) ("[F]abricating evidence that [the officer] knows to be false is different than getting 'a reluctant witness to say what may be true.'") (quoting *Fields*, 740 F.3d at 1112).

Although Coleman characterizes Brooks's interrogation as Rabe supplying 100 percent of the inculpatory material, the record does not support that characterization. Brooks's deposition testimony indicates Rabe confronted him with facts provided by the victims and the police's theory of the crime. There is nothing unconstitutional about a law enforcement officer confronting a suspect with direct questions about information supplied by others—such interrogation techniques are standard.[12] Coleman cannot save a claim based on coercive interrogation techniques via speculation that defendants were knowingly fabricating evidence. *Petty*, 754 F.3d at

---

[12] *See*, *e.g.*, FRED E. INBAU, ET AL., CRIMINAL INTERROGATION AND CONFESSIONS 111 (4th ed. 2001) ("[D]irect questions force a deceptive suspect to either offer incriminating evidence or lie."); FEDERAL BUREAU OF INVESTIGATION, HIGH-VALUE INTERROGATION GROUP, INTERROGATION BEST PRACTICES 4–5 (Aug. 26, 2016), https://www.fbi.gov/file-repository/hig-report-august-2016.pdf/view (describing how an interrogator should confront suspect with additional evidence contradicting the suspect's previous denial).

423 ("'Manufactured false evidence' and 'false identification' are not magic talismans that will transform a coercion case into an evidence fabrication case and give rise to a cognizable claim where one does not exist.").

In sum, Coleman has highlighted a variety of arguments attacking the credibility of Brooks's incriminating statement. But that is not evidence defendants knew Brooks was lying. At his criminal trial, Coleman was entitled to impeach Brooks's statement with the coercive elements of Rabe's interrogation. *Avery*, 847 F.3d at 439. His defense counsel did exactly that when cross-examining Brooks.[13] The record in this case does not support a reasonable conclusion that defendants knowingly fabricated false evidence to convict Coleman.

### 2. *Tequilla Miller's identifications were sufficiently reliable for defendants to rely on them.*

Coleman's next due process theory is that defendants used unduly suggestive procedures to manipulate Tequilla Miller's identifications.

The U.S. Constitution does not mandate that photo arrays and lineups meet a certain standard of quality. *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006). For example, it does not include an equivalent to FED R. EVID. 702's

---

[13] Trial Transcript at 47, *People v. Coleman*, No. 94-CF-764 (Ill. Cir. Ct. Apr. 5, 1994), ECF No. 109-2 ("Q: When Detective Rabe showed you, showed you the picture of the dark skinned Fats, did you pick the picture out, or did he show it to you? How did that come about? A: He showed it to me. Q: And did he say something to you? … A: He said if I don't tell him, I ain't never going to see my family no more. Q: So that is what you told him? … A: Yup.").

expert opinion standard for eyewitness identifications. *See Perry v. New Hampshire*, 565 U.S. 228, 240 (2012) (rejecting "a rule requiring trial judges to prescreen eyewitness evidence for reliability any time an identification is made under suggestive circumstances"). But the Fourteenth Amendment's Due Process Clause requires the exclusion of an eyewitness identification if the unduly suggestive circumstances are so egregious as to taint the entire trial. *Id.* at 232; *see, e.g.*, *Foster v. California*, 394 U.S. 440, 442 (1969). Even where undisputedly suggestive circumstances surround an identification, the Fourteenth Amendment test looks at the totality of the circumstances to determine whether the identification remains sufficiently reliable to still be admitted. *Manson v. Brathwaite*, 432 U.S. 98, 113–14 (1977); *see also Neil v. Biggers*, 409 U.S. 188, 199–200 (1972) (detailing factors bearing on admissibility of eyewitness identifications); *Killebrew v. Endicott*, 992 F.2d 660, 664 (7th Cir. 1993) (describing the two-step process for assessing the admissibility of identifications allegedly tainted by suggestive procedures).

These principles address the admissibility of eyewitness identifications at trial, not § 1983 liability. In his criminal case, Coleman moved to suppress Tequilla's photo and lineup identifications as tainted by the early morning hallway encounter. The trial court examined those arguments at a suppression hearing but denied the motion. Coleman did not object to Tequilla's in-court identification, and he did not address the suppression ruling in his criminal appeal. Defendants in this case cannot be held liable for depriving Coleman of his constitutional rights simply because the trial court rejected Coleman's legal arguments, or because he forfeited them.

Even if a court had later found Tequilla's identifications inadmissible under the *Brathwaite/Biggers* framework, an officer is not automatically liable for violating a suspect's constitutional rights whenever a judge later deems a witness's identification inadmissible. *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012) (refusing to extend the *Biggers* framework "from trials to arrests, and from a rule of evidence to a rule of damages"). Our decision in *Phillips* notes a proviso for situations where an officer uses a specific interrogation technique clearly proscribed by existing law. *Id.* at 917 (explaining an officer may not use judicially forbidden measures "to trick a person into making an unreliable identification"). For example, an interrogator's use of physical violence to extract an identification out of an eyewitness surely violates due process. *Cf. Brown v. Mississippi*, 297 U.S. 278, 285–86 (1936) ("The rack and torture chamber may not be substituted for the witness stand.").

Although Coleman describes the early morning hallway encounter at the police station as a "show up,"[14] no evidence suggests it was anything other than happenstance. Even assuming the encounter (and Tequilla's spontaneous identification) influenced Tequilla's subsequent identifications, none of that would be attributable to any misconduct by defendants. *See Perry*, 565 U.S at 241 (holding the due process check on eyewitness identifications "comes into play only after the defendant establishes improper police conduct"); *see also*

---

[14] A showup has been defined as a "police procedure in which a suspect is shown singly to a witness for identification, rather than as part of a lineup." *Showup*, BLACK'S LAW DICTIONARY (10th ed. 2014).

*Biggers*, 409 U.S. at 200–01 (affirming admission of eyewitness identification following a show up).

Rabe's "cold search" for photos of possible suspects may not have followed best practices, but it was not so suggestive as to deprive Coleman of a fair trial. *Alexander*, 433 F.3d at 555. Neither was Coleman's lack of a yellow wristband. No evidence indicates Tequilla noticed the wristbands, much less that they influenced her identification. *Compare with Coleman v. Alabama*, 399 U.S. 1, 6 (1970) (identification not fatally tainted by the fact only the defendant wore a hat, even though one of the assailants had worn a hat); *United States v. Traeger*, 289 F.3d 461, 474–75 (7th Cir. 2002) (identification not unduly suggestive despite the fact only the defendant wore a visible ankle restraint); *United States v. Williams*, 522 F.3d 809, 812 (7th Cir. 2008) (affirming decision to admit identification, despite the fact the defendant was the only participant wearing white shoes).

Taking these allegedly suggestive elements together, Tequilla's identification still bore enough indicia of reliability to warrant defendants' reliance. She testified at the suppression hearing and at trial that she saw Coleman's face for "a good three minutes" under nearby lamp light, that she recognized him from her years living in the Warner Homes, and that she was "positive" in her identification. *Compare with Biggers*, 409 U.S. at 200 (identification admissible because victim spent up to thirty minutes with her assailant and testified she had "no doubt" the defendant was her assailant); *Brathwaite*, 432 U.S. at 114–15 (due process not violated because witness viewed the defendant for several minutes and expressed certainty in his identification two days later); *Killebrew*, 992 F.2d at 664 (ruling an identification admissible

because eyewitness testified she made it based on her independent recollection of the incident and her observation of the perpetrator for "between thirty seconds and three minutes"); *United States v. Curry*, 187 F.3d 762, 769 (7th Cir. 1999) (identification admissible when eyewitness looked the perpetrator "straight in the face" at a short distance, albeit for only a short time); *United States v. Funches*, 84 F.3d 249, 255 (7th Cir. 1996) (eyewitness's identification reliable based on her testimony that she had a clear view of the robber's entire face as he walked by 20 feet away). There is no evidence suggesting defendants knew Tequilla's identifications were tainted. *Phillips*, 668 F.3d at 915–16.

As with Brooks, Coleman's appellate briefs develop a solid cross-examination outline for Tequilla's identifications. But such arguments do not establish a constitutional violation. After all, "the validity of an eyewitness identification is for the jury." *Id.* at 916. Due process is not offended by the introduction of a questionable eyewitness identification; the jury may observe the witness, assess any alleged suggestive circumstances, and make its own determination about what weight, if any, to give it. *Brathwaite*, 432 U.S. at 116 ("[E]vidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."). Tequilla's identifications were not so clearly tainted as to deny Coleman a fair trial.

### 3. Defendants are entitled to summary judgment on Coleman's **Brady** theory.

Coleman's last due process theory also concerns Tequilla Miller's identifications. He contends defendants suppressed

favorable impeachment evidence by failing to turn over the photo of the lineup shown to Tequilla.

Police officers must provide exculpatory and/or impeachment evidence to prosecuting attorneys—a corollary to the prosecutor's obligation to disclose such evidence to defense counsel under *Brady v. Maryland*, 373 U.S. 83 (1963). *Cairel v. Alderden*, 821 F.3d 823, 832 (7th Cir. 2016); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule."). To succeed on a civil claim against a police officer for an alleged failure to disclose such evidence, a plaintiff must prove: (1) the evidence at issue is favorable to his defense; (2) the officer concealed the evidence; and (3) the concealment prejudiced him. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also Goudy v. Cummings*, No. 17-3665, 2019 WL 1930509, at *3 (7th Cir. May 1, 2019).

The third element, prejudice, is demonstrated by proving the "materiality" of the evidence withheld, which requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008); *see also Goudy*, 2019 WL 1930509, at *7. A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

The district court ruled Coleman failed to demonstrate the lineup photo's materiality. It reasoned that because Tequilla's identification was sufficiently reliable to have been admitted regardless of the wristband discrepancy, "evidence of an additional suggestive aspect of the identification procedures would not be material." Order at 24, *Coleman v. City of Peoria*, No. 1:15-cv-01100-SLD-TSH (C.D. Ill. Mar. 9, 2018), ECF

No. 121. But just because a witness's testimony is sufficiently reliable to put before a jury does not render all possible impeachment evidence immaterial for *Brady* purposes. For example, a prosecutor's assurance of a reward to a testifying witness may not render that witness's identification automatically inadmissible, but disclosure of that fact may be material if its marginal impeachment value is great enough to call into question the outcome of the verdict. *See Bagley*, 473 U.S. at 684.

Despite disagreeing with the district court's rationale, we agree with its conclusion based on the facts in this case. Nothing in the record suggests Tequilla noticed the wristbands, much less that they played a role in her selection of Coleman from the lineup. Rather, Tequilla testified repeatedly that she based her identifications on her recognition of Coleman's face. As noted above, she explained she viewed his face for "a good three minutes" during the burglary and that it stuck out to her because she recognized him from her time in the Warner Homes. Tequilla's testimony was then reinforced by an adamant identification made by Bertha Miller.

Another recent case from our court provides a useful contrast. *Goudy v. Cummings*, No. 17-3665, 2019 WL 1930509 (7th Cir. May 1, 2019). In *Goudy*, the suppressed impeachment evidence consisted of videotapes showing that three of the prosecution's five identification witnesses initially identified another man as the perpetrator, as well as police reports in which the prosecution's star witness gave a statement directly contradicting his trial testimony. *Id.* at *7–8. On summary judgment, this court held such evidence could reasonably be considered material. *Id.* at *8. We have nothing analogous here. Rather than a video of key witnesses identifying another man as the perpetrator (thus impeaching their courtroom

identifications), Coleman points to a photo showing a discrepancy in the attire of lineup participants. Coleman lacks any evidence that Tequilla Miller noticed the discrepancy or assigned it any significance, much less that her multiple, consistent identifications were influenced by it.

Coleman contends the materiality of this evidence is a fact question for the jury. But the Supreme Court has ruled on *Brady* materiality as a matter of law, *see*, *e.g.*, *Strickler*, 527 U.S. at 296, as has this court. *See*, *e.g.*, *Carvajal*, 542 F.3d at 568–69. Because the record does not support a reasonable possibility that the criminal jury's verdict would have been different had the lineup photo been disclosed to Coleman's defense counsel, Coleman's *Brady* theory fails. *See Strickler*, 527 U.S. at 381 ("[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.").

The record does not present a genuine issue of material fact on any of Coleman's three due process theories, so the district court did not err in awarding defendants summary judgment on this claim.

### B. Fourth Amendment and Malicious Prosecution Claims

Count IV alleges defendants violated Coleman's Fourth Amendment rights by detaining him without probable cause for arrest. Similarly, Count V is a state law tort claim for malicious prosecution. Although one is a federal constitutional claim and the other is a state tort, the existence of probable cause defeats both. *See Fleming v. Livingston Cty.*, 674 F.3d 874, 878 (7th Cir. 2012) (Fourth Amendment claim); *Swick v.*

*Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996) (Illinois malicious prosecution claim). Probable cause exists where the police officer is aware of facts and circumstances "sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *see also Poris v. Lake Holiday Prop. Owners Ass'n*, 983 N.E.2d 993, 1007–08 (Ill. 2013) (similar).

The basis for Coleman's Fourth Amendment and malicious prosecution claims overlaps with his due process arguments. He asserts defendants knew they lacked probable cause to arrest him because they knew Brooks's statement was false and Tequilla's identifications were tainted.

Notably, an Illinois grand jury indicted Coleman on all four charged felonies, and such an indictment is prima facie evidence of probable cause. *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015). Coleman points out that this presumption may be rebutted by evidence that law enforcement obtained the indictment through improper or fraudulent means. *Id.* at 1085–86; *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019); *Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286, 289 (Ill. 1965). Coleman must demonstrate defendants knew they lacked probable cause to arrest him. *Williamson v. Curran*, 714 F.3d 432, 444 (7th Cir. 2013).

Rabe and the other officers may have known that Brooks was reluctant to testify against Coleman, and that Brooks later recanted his original incriminating statement. But that does not mean the officers knew Brooks's statement was false. Police officers are constantly faced with reluctant witnesses and recanted confessions. Yet they are not required "to use the rules for summary judgment and draw inferences in favor of the suspects." *Bridewell v. Eberle*, 730 F.3d 672, 676 (7th Cir.

2013). Where a reasonable person would have a sound reason to believe the suspect committed a crime, the police may arrest and allow the criminal justice system to determine guilt or innocence. *Askew v. City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006).

Similarly, even assuming defendants subjectively doubted Tequilla's identifications, it is for the judge and jury to weigh her evidence. *Cf. Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015) ("In real-world investigations, police often confront the limits of human memory and facial recognition."). Tequilla's identifications, even if questionable, were enough to give defendants probable cause to arrest. *See Cairel*, 821 F.3d at 835 (eyewitness identification gave defendants probable cause to arrest plaintiff, despite witness's hesitancy and inconsistencies with earlier descriptions).

The undisputed facts show defendants had probable cause to arrest Coleman. This defeats Coleman's Fourth Amendment claim and his state law malicious prosecution claim.[15]

## C. Remaining Claims

Coleman's conspiracy, failure to intervene, and municipal liability claims each depend on proof of an underlying constitutional violation. *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (conspiracy); *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (failure to intervene); *Petty*, 754 F.3d at 424 (municipal liability). Because Coleman has failed to present evidence supporting an underlying violation, defendants are

---

[15] As a result, we need not reach the parties' alternative arguments about whether the criminal proceedings in Illinois state court terminated in Coleman's favor and the timeliness of his Fourth Amendment claim.

entitled to summary judgment on Coleman's derivative claims as well.

After disposing of Coleman's § 1983 claims on their merits, the district court declined supplemental jurisdiction over four of Coleman's state law claims and dismissed them without prejudice. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if … the district court has dismissed all claims over which it has original jurisdiction."). The court explained it retained jurisdiction over the malicious prosecution claim because its probable cause determination was dispositive for that claim. 13D CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 3567.3 (3d ed. Apr. 2019 supp.) ("[A]lthough it is unusual, it is permissible for the federal court to decide one supplemental claim on the merits while declining to hear another supplemental claim.").

A federal court's decision to exercise supplemental jurisdiction over state law claims is discretionary. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Dargis v. Sheahan*, 526 F.3d 981, 990 (7th Cir. 2008). Absent unusual circumstances, district courts relinquish supplemental jurisdiction over pendent state law claims if all claims within the court's original jurisdiction have been resolved before trial. *Dargis*, 526 F.3d at 990; *see also Sharp Elec. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009). We see no abuse of discretion in the district court following that typical approach in this case. *See Capeheart v. Terrell*, 695 F.3d 681, 686 (7th Cir. 2012) (noting that a district court's decision to relinquish supplemental jurisdiction will be reversed only in extraordinary circumstances).

## III. Conclusion

Erroneous convictions are unquestionably human tragedies. Yet a vacated criminal conviction does not automatically establish that an individual's constitutional rights were violated, or that police officers and prosecutors are necessarily liable under § 1983.

Here, Coleman failed to present sufficient evidence to support his claims that defendants violated his constitutional rights. Because the record does not present a genuine issue of material fact for trial, we AFFIRM the district court's decision to award defendants summary judgment on Coleman's § 1983 claims and Illinois state law malicious prosecution claim, as well as its decision to dismiss Coleman's remaining state law claims without prejudice.