In the

# United States Court of Appeals
## For the Seventh Circuit

————————

No. 22-1067

THOMAS MOORER,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellees.*

————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cv-03796 — **Manish S. Shah**, *Judge.*

————————

ARGUED MARCH 29, 2023 — DECIDED FEBRUARY 9, 2024

————————

Before SYKES, *Chief Judge,* and ROVNER and BRENNAN, *Circuit Judges.*

ROVNER, *Circuit Judge.* Thomas Moorer was arrested and indicted on charges including murder and attempted murder, and ultimately was acquitted by a jury of those charges. He then brought an action under 42 U.S.C. § 1983, alleging that the defendants, officers of the Chicago Police Department, violated his Fourth Amendment rights in that they lacked probable cause for his pretrial detention. The district court granted

summary judgment in favor of the defendants, and Moorer appeals that determination.

We begin, as did the district court, with facts not disputed by the parties. At around midnight on August 27, 2010, a number of men went to the apartment shared by Edward Ramos, his brother Edwin Ramos, and three of his cousins, Miguel Velez, Walter Velez, and Eliezer Martinez, and their ensuing actions culminated in the murder of Edward.[1]

On the night of Edward's murder, three friends, Jacklyn Hernandez, Alina Kindelan, and Delia Rivera, pulled up to the apartment shortly before midnight. Walter emerged from the apartment to speak with his girlfriend, Hernandez, in the car, and the other two women exited the car and began walking toward the apartment. At that time, a man dressed in black clothing and brandishing a gun stepped out from the gangway of the building and told them to go away. During that interaction, the lower part of his face was covered. Although the area was dark, as the man moved toward them, he traversed an area lit by streetlights. The two women got back into the car with Hernandez, and the man forced Walter to the apartment door. A second man then emerged from the gangway, at which time the three women drove away and called 911.

The first man then held a gun to Walter's head and instructed him to knock on the apartment door. When Edward opened the door, the man rushed into the apartment and began shooting. In a struggle for the gun, Edward and Martinez fell to the ground. The armed man, whose face by now was

---

[1] We refer to Edward and Edwin Ramos and Miguel and Walter Velez by their first names to avoid confusion.

uncovered, then fired several shots while standing, striking Martinez in the leg. Hearing the shots from another room of the apartment, Miguel looked into the living room, saw Edward struggling with the man, and ran out the back door. Edwin also heard the struggle, saw a man on top of Edward and Martinez, and ran to assist. The armed man hit Edwin in the head with the gun, but Edwin punched him and he dropped his weapon. The man then ran out of the apartment with Edwin in pursuit. When he reached the outside, Edwin saw a second man pointing a gun at him. The first man instructed his accomplice to start shooting. As Edwin lunged backward into the doorway, Edward moved past him, entering into the line of fire, and was shot in the chest. The two men fled, and Edwin drove his brother Edward and Martinez to the hospital. Edward died later that night.

Officers from the Chicago Police Department arrived at the scene within minutes after the shooting and began canvassing the area and gathering physical evidence. At the police station, interviews were conducted individually with witnesses Edwin, Miguel, Walter, Hernandez, Kindelan, and Rivera. Edwin informed Detective Valkner that he recognized the man who entered the apartment. He stated that the man's nickname was "Boom," and that his brother had sold drugs to the man and a dispute had arisen over an unpaid debt. Edwin further stated that Boom had made threatening phone calls to his brother in the week before the shooting. He told the detectives that Edward's phone contained contact information for Boom.

A cell phone was recovered at the scene, but Detective McDermott instructed the forensic investigator to turn it over to him. The phone, however, was never properly inventoried

and its ultimate whereabouts is unknown. Police reports indicate that Edwin identified a cell phone at the station and that he and Valkner searched the phone and located an entry for "Boom" and a phone number associated with the name. Neither Edwin nor Valkner later remembered that event.

An officer ran a nickname search for "Boom" in a database. Detective Gonzalez stated that the database search yielded a photograph of Moorer which was then placed in a photo array, although Gonzalez could not recall details as to how the search was conducted and the photo chosen. The detectives then had Edwin review two books or "a bunch of papers" that included photographs of six people on each page. From those pages, Edwin identified Moorer as having been involved in the shooting. The detectives then left and returned with a printout including Moorer's image, and asked Edwin to confirm his identification, circle Moorer's photo, and sign his name under the image.

A photo array was subsequently created of six photographs, including Moorer's, and shown to Hernandez, Edwin, Kindelan, Rivera and Miguel. Before viewing the array, each witness signed an advisory form acknowledging that a suspect would not necessarily be in the spread and that the witness was not required to make an identification. Individually, each one of those five witnesses positively identified Moorer as being involved in the attack, and Hernandez, Edwin, and Miguel confirmed that they were 100 percent certain in their identification.

Assistant State's Attorney Maria Augustus then came to the police station and was briefed on the investigation, reviewed police reports, and reinterviewed witnesses with McDermott. Following those interviews, McDermott and

Augustus mutually agreed to issue an investigative alert with probable cause to arrest Moorer.

Once Moorer was taken into custody, detectives then learned that Moorer's nickname was "Boomer" rather than Boom. Moorer informed them that he had been home on the day of the shooting with his sisters and his sisters' children. He also told them the name of someone who could confirm that alibi, and the district court held that the reasonable inference from the context of his statement was that the person he was referring to was his girlfriend, Lakisha Shorter. The detectives did not interview her, although she answered the door when they went to Moorer's residence. But they did speak with his sisters, who were the persons he claimed to be with, and the sisters were subsequently brought to the station to provide signed statements. One of them signed a statement stating that she was asleep from 10pm to 2am during the night of the offense and that she did not see Moorer between 7pm and 2am that night. The other sister's statement provided that her cousin had a party with around ten people on the first floor of the home that night, that she was upstairs taking care of her child most of the time during that night, and that she saw Moorer some of the times that she went downstairs to the party but not every time. Dist. Ct. Docket 165, Exhs. 39, 40.

Witnesses Edwin, Miguel, Walter, Kindelan, Hernandez, and Rivera returned to the station to view an in-person lineup, which included Moorer and four other individuals. The witnesses viewed the lineup independently of each other and waited in separate rooms following the viewing until all the witnesses had finished viewing the lineup. Walter identified Moorer but was only 80 percent certain, and his identification was treated by Detective Gonzalez as a negative

identification. Rivera, Edwin, Hernandez, Kindelan, and Miguel positively identified Moorer as the perpetrator, and none of those witnesses expressed any doubt in their identification. Assistant State's Attorney Augustus reinterviewed all six witnesses, who provided videotaped statements of their accounts. The next day, Martinez was released from the hospital and proceeded to the police station. The detectives assembled another physical lineup including Moorer and others, and Martinez, who had never viewed the photo array and therefore could not have been influenced by that prior exposure, identified Moorer as the assailant.

On August 30, Augustus approved three felony charges against Moorer of first degree murder, attempted murder, and aggravated battery with a firearm. In September 2010, a grand jury returned a 135-count indictment charging Moorer with first-degree murder and other crimes. Moorer's criminal trial was not held until July 2017—although the reason for that lengthy delay is neither discussed nor challenged in this case—and the jury found Moorer not guilty on all counts. Moorer then filed this lawsuit contesting the constitutionality of his pretrial detention.

Moorer argues that probable cause did not exist because each of the identifications were flawed in that they were coached, were based on descriptions of the event that would have been physically impossible for the witness to observe, were unreliable because the witness did not see the offender, or contained erroneous facts about the offender. He asserts that the unreliability of those identifications was further confirmed by facts that emerged when he was arrested. Although the district court rejected those arguments and granted summary judgment in favor of the defendants, Moorer argues that

the district court improperly examined whether the identifications were coerced or manipulated, asserting that the correct framework for a probable cause determination should focus on reliability and the totality of the circumstances.

Summary judgment is appropriate when, taking all reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Young v. City of Chicago*, 987 F.3d 641, 643 (7th Cir. 2021); Fed. R. Civ. P. 56(a). We review the district court's grant of summary judgment de novo. *Id*.

The Fourth Amendment protects against unreasonable seizures, and the "general rule [is] that Fourth Amendment seizures are reasonable only if based on probable cause to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013) (internal quotation marks omitted); *Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019). "[T]he constitutional injury arising from a wrongful pretrial detention rests on the fundamental Fourth Amendment principle that a pretrial detention is a 'seizure'—both *before* formal legal process and *after*—and is justified only on probable cause." *Lewis*, 914 F.3d at 476–77; *Manuel v. City of Joliet*, 580 U.S. 357, 366–67 (2017). Accordingly, the Fourth Amendment can be violated by a detention without probable cause "not only when it precedes, but also when it follows, the start of legal process in a criminal case." *Manuel*, 580 U.S. at 366–67; *Mitchell v. Doherty*, 37 F.4th 1277, 1284 (7th Cir. 2022).

Probable cause is a fluid concept that is based on the totality of the circumstances. *Garcia v. Posewitz*, 79 F.4th 874, 879–80 (7th Cir. 2023); *Illinois v. Gates*, 462 U.S. 213, 232–33 (1983). It is established where a probability or a substantial chance of

criminal activity exists and does not require a certainty that a crime was committed. *Gates*, 462 U.S. at 243, n.13. As the Court has repeatedly noted, probable cause "'is not a high bar.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018), quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014). It is assessed objectively, based upon conclusions that an arresting officer reasonably could draw from the information known. *Young*, 987 F.3d at 644.

An unlawful detention without probable cause can occur in varied circumstances, such as "'when the police hold someone without any reason before the formal onset of a criminal proceeding, … [b]ut it can also occur when the legal process itself goes wrong—when, for example, a judge's probable cause determination is predicated solely on a police officer's false statements.'" *Lewis*, 914 F.3d at 476, quoting *Manuel*, 580 U.S. at 367; *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 344 (7th Cir. 2019). Similarly, the withholding of information by officers that would be material to the probable cause determination can also undermine the probable cause determination and result in a violation of the Fourth Amendment. See *Camm v. Faith,* 937 F.3d 1096, 1106–07 (7th Cir. 2019). In those situations, although the defendant may have obtained legal process such as a hearing or a grand jury proceeding, that process itself has "done nothing to satisfy the Fourth Amendment's probable-cause requirement … [a]nd for that reason cannot extinguish the detainee's Fourth Amendment claim." *Manuel*, 580 U.S. at 367; *Young*, 987 F.3d at 646. In *Kuri v. City of Chicago*, 990 F.3d 573, 575 (7th Cir. 2021), the defendants argued that the Fourth Amendment challenge to pretrial detention failed as a matter of law because the order detaining Kuri for trial was controlling unless the judicial process had been corrupted. We recognized that pre-*Manuel* that argument might

have found some support, but that *Manuel* recognized that a Fourth Amendment challenge based on a lack of probable cause survives a judicial decision holding a suspect in custody, and therefore that "the right question is whether the arrest and detention are supported by probable cause." *Id*. at 575; see also *Lewis*, 914 F.3d at 474. Accordingly, the mere existence of legal process in the pretrial detention does not itself defeat a constitutional challenge under the Fourth Amendment.

We have recognized that *Manuel* did not *sub silentio* overrule *Kaley v. United States*, 571 U.S. 320, 328 (2014), however, which held that a grand jury indictment cannot be challenged based on whether the probable cause finding was founded on sufficient proof. *United States v. Schreiber*, 866 F.3d 776, 781 n.8 (7th Cir. 2017). But here, Moorer does not argue that the information presented to the grand jury was insufficient to establish probable cause. Similar to the plaintiff in *Coleman*, he argues that the indictment was obtained through improper or fraudulent means because the defendants withheld information and knew that the identifications were not reliable. See *Coleman*, 925 F.3d at 351. And as in *Coleman*, to succeed Moorer must demonstrate that the defendants knew they lacked probable cause to arrest him. *Id*.; *Lewis*, 914 F.3d at 477. Because the defendants did not lack probable cause here, the claim must fail.

Moorer alleges that the prosecutor was unaware of all of the facts known to the officers, and that the prosecutor would have concluded there was no probable cause if properly informed. Moorer fails to provide a sufficient factual basis for that argument, relying largely on speculation as to what was known by the prosecutors and the officers, but we need not

explore that argument because Moorer can point to no evidence known to the defendants that could have impacted the existence of probable cause. Even considering all of the evidence known to the officers at the time, there was probable cause to detain Moorer and therefore the district court properly granted summary judgment in favor of the defendants.

We have held that an identification by even one eyewitness who lacks an apparent grudge against the accused person is sufficient to demonstrate probable cause. *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012); *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003) ("The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate.") Here, seven witnesses to the offense independently identified Moorer as the perpetrator. In addition, Moorer went by a nickname, Boom, that was similar to and indeed merely a shortened version of the "Boomer" name that had been identified as the name of the person involved.

Moorer does not allege that those identifications were falsified. In fact, Moorer repeatedly disavows any argument that the identifications were coerced or manipulated, arguing the proper focus is on reliability. He fails, however, to point to evidence that would make the identifications so incredible that an officer could not reasonably believe the witnesses were telling the truth. *Coleman*, 925 F.3d at 351 (noting that even questionable witness identifications are enough to provide probable cause to arrest); *Garcia*, 925 F.3d at 351 ("[a]n officer need not even believe that a witness is reliable to

determine that her statement supports probable cause for an arrest because the assessment of credibility rests with courts, not officers"); *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016). In fact, we have held that even the recantation of a statement by a witness does not on its own negate probable cause. *Garcia*, 79 F.4th at 880, citing *Coleman*, 925 F.3d at 351. Instead, Moorer consistently seeks to impose a trial-level burden of proof on a probable cause pretrial detention. He points to facts that undermine the identifications, which would be proper arguments to pursue on cross-examination and in closing arguments at trial, but which do not preclude reliance by the officers in establishing probable cause.

For instance, Moorer argues that the viewing conditions were poor. He further asserts that the details of the eyewitness identifications "show that for each witness there was a specific reason to doubt their reliability." Appellate Brief at 33. Toward that end he challenges details of and inconsistencies in the descriptions, or questions whether some witnesses could have seen Moorer sufficiently to provide a description. He points out that Moorer's nickname was not an exact match, that Moorer lacked injuries to his body, that other potential alibi witnesses were not pursued, that Edwin was coached to pick Moorer's photo out of the array, and that DNA evidence subsequently showed that Moorer was not at the scene. Some of those arguments overstate the factual record. The lack of DNA from Moorer on evidence found at the scene that ostensibly came from one or more of the attackers does not establish that Moorer was not at the scene; it just fails to provide support for the claim that Moorer was at the scene. And the identification of Moorer by Edwin from the pages of photos was not in any way compromised by the post-identification actions of copying the photo and having Edwin circle

and sign the photo to confirm the identity. Moorer's use of those facts overstates their significance.

Moreover, all of those arguments by Moorer, and the many similar ones raised by him, are arguments for trial. The question for pretrial detention is not whether the officers have evidence beyond a reasonable doubt that Moorer committed the crime. Nor is it whether a judge or jury could choose to disbelieve the witnesses. As we noted in *Coleman*, police officers are constantly faced with reluctant witnesses, recanted confessions, and witness identifications replete with inconsistencies, but the weighing of evidence is for the judge and jury. *Coleman*, 925 F.3d at 351. "Where a reasonable person would have a sound reason to believe the suspect committed a crime, the police may arrest and allow the criminal justice system to determine guilt or innocence." *Id*.: *Beauchamp*, 320 F.3d at 743, 745 (holding that it is not the obligation of the police to exclude all suggestions that the witness is not telling the truth, and that "the responsibility of sorting out conflicting testimony and assessing the credibility of putative victims and witnesses lies with the courts"). *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000) ("so long as a reasonably credible witness or victim informs the police that someone has committed … a crime, the officers have probable cause to place the alleged culprit under arrest …. [and] once such a reasonably credible complaint has been made, the existence of probable cause to arrest does not depend upon the actual truth of the complaint") (internal quotation marks omitted). Moorer has not identified any facts known to the defendants that would eliminate probable cause, and therefore no evidence withheld from the prosecutor or the grand jury that could impact the probable cause determination. See *Young*, 987 F.3d at 645 (upholding summary judgment for defendants

even assuming they committed misconduct in falsifying evidence, because the evidence even as the plaintiff described it gave the officers adequate probable cause to detain him). None of the evidence negates the probable cause established by the witness identification—and here there is not one but seven independent witness identifications of Moorer as the perpetrator. The undisputed evidence in the record establishes probable cause for the pretrial detention.

Accordingly, the decision of the district court is AFFIRMED.