In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-1304

TERRELL ESCO,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cv-02324 — **Elaine E. Bucklo**, *Judge.*

———————————

ARGUED DECEMBER 8, 2023 — DECIDED JULY 9, 2024

———————————

Before SYKES, *Chief Judge,* and RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Terrell Esco alleges that he was unlawfully detained and maliciously prosecuted based on the illegal actions of City of Chicago police officers, who arrested him for weapons and drug violations. After the City dropped the charges, Esco sued, claiming that the officers seized and prosecuted him on weapons charges when they knew he was not the person they saw in possession of a gun. In response to

Esco's assertion that the police officers' body-worn camera video evidence would incontrovertibly support his claim, the district court judge viewed the video and held that the officers had probable cause to detain Esco, eliminating the viability of any of Esco's claims. After exploring and approving of the district court's reliance on the video evidence in granting the motion to dismiss, we agree with its assessment that Esco failed to allege any plausible claims.

## A. Probable cause and the facts

We begin, in a somewhat unusual manner, by setting forth the law, so that we might spotlight the facts relevant to the proper legal question, which, at times, gets lost in the shuffle of Esco's allegations. This case evolved from an incident involving Esco and a gun. But this case is not about whether Esco possessed or discarded the gun, or for that matter, whether he definitively committed any crime. Esco has filed a federal §1983 suit alleging that police officers infringed on his civil rights by unlawfully detaining him in violation of the Fourth Amendment and by maliciously prosecuting him under Illinois law.[1] He argues that the officers who arrested him, and then initiated acts that led to his detention and prosecution, had no probable cause to do so. Specifically, he asserts that at the time the officers arrested Esco they knew that he

---

[1] In the district court, Esco set forth four claims against the defendants: Count I: 42 U.S.C. §1983—Unreasonable Seizure/False Arrest; Count II: 42 U.S.C. §1983—unreasonable search; Count III: 42 U.S.C. §1983—Fourth Amendment unlawful detention; Count IV: state law claim for malicious prosecution and indemnification by the City of Chicago pursuant to 745 ILCS 10/9-102; and Count V: state law claim against the City of Chicago under the doctrine of respondeat superior. On appeal, Esco has abandoned the claim for false arrest and unreasonable search.

was not the individual whom they saw throw a weapon under a car, but falsely claimed that he was. This, he alleges, led to his detention and unwarranted prosecution.

Because this is a suit against the City and several of its police officers for unlawful detention and malicious prosecution, the defendants do not have to prove that Esco possessed the weapon. The questions in this appeal are whether the officers had probable cause to detain Esco on a weapons charge, and whether they reasonably conveyed information that led to his detention and prosecution. The factual focus, therefore, must be on what reasonable officers would have surmised, given the situation surrounding them—not on proving if Esco was, in actuality, doing what the officers thought he was doing. That is because the determination of probable cause is based on an objective assessment of what a reasonable officer could conclude based on information known to officers at the scene. *Moorer v. City of Chicago*, 92 F.4th 715, 720 (7th Cir. 2024). "In making that assessment, the court must consider the facts as they reasonably appeared to the arresting officer, seeing what he saw, hearing what he heard, and so forth." *Holmes v. Vill. of Hoffman Est.*, 511 F.3d 673, 679 (7th Cir. 2007). "An officer has probable cause when, 'at the time of the arrest, the facts and circumstances within the [officer's] knowledge 'are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed … an offense.'" *Madero v. McGuinness*, 97 F.4th 516, 522 (7th Cir. 2024) (*quoting Lawson v. Veruchi*, 637 F.3d 699, 703 (7th Cir. 2011)). "This is a 'common-sense inquiry requiring only a probability of criminal activity,"' not certainty that a crime has occurred. *Braun v. Vill. of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022) (*quoting Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016)); *Moorer*, 92 F.4th at 722.

In this case, the assessment of probable cause for detention is based on the same set of facts as the assessment of probable cause for an arrest, as the officers used the facts gathered at the time of Esco's arrest as support for his continuing detention and later prosecution. This is not a case in which Esco accuses the relevant state actors of creating new facts after his arrest. *Cf. Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 360–61 (2017) (Plaintiff alleged that after the initial arrest, a police evidence technician lied in his report stating that pills found on the suspect tested positive for the presence of ecstasy, when in fact, they had not, thus extending the suspect's time in custody). Esco's complaint asserts that the police officers drafted false police reports and made false statements to prosecutors and judges. But all of those allegations assume that the officers were continuing to use the same false information that they used for Esco's initial arrest—that is, that Esco possessed a handgun and then threw it under a car—even though the officers knew he was not the person they saw in possession of the handgun. Consequently, the facts that are relevant to the determination of probable cause for the detention and malicious prosecution claims, are the same facts that are relevant to whether the officers had probable cause to arrest Esco.

The relevant facts, therefore, are those that shed light on whether the police officers were reasonable in thinking that Esco had likely committed a crime. *Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022). And as we noted, that means we must look at the facts known to the officers at the time of Esco's arrest, bearing in mind that information that supports probable cause can come from one officer who relays that information to others. *United States v. Smith*, 989 F.3d 575, 582 (7th Cir. 2021). With that lengthy background legal explanation aside, we recount the facts as follows:

On May 9, 2020, officers were conducting remote video surveillance of a residence on North Pine Avenue in Chicago using a police observation device ("POD"). While monitoring activity on the POD, they observed a man—who all parties agree was not Esco—leave the residence and walk down the street toward a group of individuals while holding a firearm. Officers Lopez and Segovia, who are partners, went with Officer Cledon to the surveilled residence to investigate, but when they arrived, they found that they had something else to investigate: a group of individuals in the middle of the street. As they approached, they saw someone throw a gun under a vehicle and run. According to Esco, he was not the person who threw the gun under the vehicle and ran, but rather it was the person the officers initially saw on the POD who discarded the weapon. He concedes, however, that he did, in fact, run. When officers caught up to him, Esco explained that he ran because he had "a lot of weed," but he denied having a gun. R. 8-4 at 2:08–2:27.[2]

In his complaint, Esco asserted that despite knowing that someone else threw the gun and ran, the officers nevertheless arrested him and falsely stated in their police reports that he possessed the weapon. This, he claims, led to the eventual charges for being an armed habitual criminal, a felon in possession of a firearm, and for aggravated unlawful use of a weapon.[3] Although he did not attach any video exhibits to his complaint, Esco alleged that body-worn camera video revealed

---

[2] For citations to the video evidence, we note only the start time, unless the relevant action or conversations extended across a longer timeframe.

[3] Esco was not prosecuted on any drug charges.

the officers discussing the fact that he was not the individual they saw with the gun. According to Esco's complaint, these knowingly false claims continued throughout his criminal proceedings as officers drafted intentionally false police reports, gave intentionally false information to the state's attorney's office, made false statements at a preliminary hearing, and failed to correct this false information over the course of his detention, until the court granted the State's motion to dismiss the charges *nolle prosequi* on May 10, 2021.

We have begun with the facts as alleged in Esco's complaint and brief on appeal, (and those that are undisputed), for when we review a district court's grant of a motion to dismiss, we accept the well-pleaded facts in the complaint as true and draw reasonable inferences in the plaintiff's favor. *Bronson v. Ann & Robert H. Lurie Children's Hosp. of Chicago*, 69 F.4th 437, 448 (7th Cir. 2023). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Although we accept the well-pleaded facts, we note that district courts are free to consider "'any facts set forth in the complaint that undermine the plaintiff's claim.'" *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (*quoting Hamilton v. O'Leary*, 976 F.2d 341, 343 (7th Cir.1992)). The court, therefore, may examine exhibits, including video exhibits, attached to the complaint, or referenced in the pleading if they are central to the claim. *Id.; see also Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (explaining that a court may consider exhibits referred to in a complaint, even if not attached to it, lest a "plaintiff could evade dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that proved that his claim had no merit.").

Esco did not attach video from the body-worn cameras, but he relied on it for the allegations in his complaint that the officers "can be heard on body-worn camera discussing the fact that Plaintiff was not the individual they saw with the gun." R. 1 at 3, ¶12; *see also Id.* at ¶21 (alleging that video "footage confirmed that Plaintiff was not the individual seen with the gun."). The defendants included the video with their motion to dismiss. Esco concedes that the district court could consider the video from the body-worn cameras, as Esco referenced it in his complaint and according to Esco, it was "dispositive of the issue of probable cause." Esco Br. at 7; *see also* Reply Br. at 1. Although a district court, in a motion to dismiss, must take the plaintiff's well-pleaded facts as true, when an exhibit, including a video exhibit, "incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Bogie*, 705 F.3d at 609. This is because to survive a motion to dismiss, the complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A complaint that contradicts uncontroverted video is not plausible. The plaintiff can still contest the meaning or significance of the exhibit, but where the plaintiff's case depends on contradicting a fact that seems plain from the exhibit, the plaintiff will "need[] to explain her position." *Bogie*, 705 F.3d at 609. The district court judge below described her practice as one in which, on a motion to dismiss, she considers video evidence that discredits a plaintiff's account of the facts but views the video in the light most favorable to the plaintiff. R. 27 at 9; *Esco v. City of Chicago*, 651 F. Supp. 3d 917, 922 (N.D. Ill. 2023). This seems an appropriately balanced practice for a district court that must accept the plaintiff's well-pleaded facts as true, while also not giving credence to facts that are clearly, definitively, and

uncontrovertibly contradicted by video footage. *Bogie*, 705 F.3d at 609; *Scott v. Harris*, 550 U.S. 372, 380 (2007) (rationalizing in the context of summary judgment, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

It warrants emphasizing, however, that a district court deciding a motion to dismiss, may not defy the Supreme Court's command to accept all facts in the complaint as true, and instead rely on video evidence unless the video "utterly discredit[s]" the non-movant's version of the facts such that there could be no reasonable disagreement about what the video depicts. *Scott*, 550 U.S. at 380. Although the *Scott* court made its admonishments in the context of summary judgment, those cautions are equally relevant when a district court judge relies on video evidence to rule on a motion to dismiss. *Bogie*, 705 F.3d at 611 ("We also recognize that any photograph or film shows only one perspective on a scene, so that additional perspectives, such as eyewitness testimony or photographs or films from different angles or different times, might reveal additional facts that would change the legal analysis."). This court has made clear that video and photographic evidence cannot be used when deciding cases as a matter of law, when the video does not clearly and definitively discredit the non-movant's facts. *See Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481–82 (7th Cir. 2023) (declining to apply the *Scott* exception when video does not clearly show the events in question); *Eagan v. Dempsey*, 987 F.3d 667, 691 n.56 (7th Cir. 2021) (noting that the *Scott* exception is a narrow and pragmatic one reserved only in cases where there is clear and irrefutable video evidence); *Ferguson v. McDonough*, 13 F.4th 574, 581 (7th Cir. 2021)

(declining to apply the *Scott* exception where the video was open to interpretation and did not utterly discredit the plaintiff's version of the facts); *Gupta v. Melloh*, 19 F.4th 990, 998 (7th Cir. 2021) (reversing a grant of summary judgment where reasonable jurors could have many different and opposing conclusions about what they saw in video evidence); *Jackson v. Curry*, 888 F.3d 259, 264 (7th Cir. 2018) (noting that a video tape does not fall within the *Scott* exception where it is subject to multiple interpretations); *McCottrell v. White*, 933 F.3d 651, 661 n.9 (7th Cir. 2019) (declining to draw independent factual conclusions from a poor-quality, black and white video lacking audio).

We agree with the assessment of both parties and the district court that it was appropriate for the district court to consider the body-worn camera video evidence when considering this motion to dismiss. That video provided the district court with the following factual information: As Officers Lopez, Segovia, and Cledon approached the group of individuals in the street, Officer Segovia suddenly exclaimed, "there he is, he threw the gun!" R. 8-1 at 3:00. As the man to whom he was referring ran away and the officers pursued him, Officer Segovia announced on the radio, "we got one running." R. 8-1 at 3:04. It is undisputed that the man who ran was Esco. Esco Br. at 7 ("Plaintiff acknowledged in his response that BWC footage shows he ran from officers … .").

As the rest of the officers continued to pursue Esco, Officer Segovia stopped to retrieve the discarded weapon and almost immediately found it under a parked car, announcing into his radio within seconds, "weapon recovered." R. 8-1 at 3:19. Meanwhile, as Officers Cledon and Lopez pursued Esco on foot, Officer Cledon relayed over his radio, "he's running

northbound," and described the suspect as having "black shirt, white sleeves. Dreads." R. 8-2 at 2:00, 2:41. Within about twenty-five seconds, another officer yelled out, "we got him," R. 8-2 at 3:06. Moments later, Officers Cledon and Lopez arrived at the scene to find a swarm of officers detaining and searching a man matching exactly the description Officer Cledon sent out over the radio of the suspect who threw a gun and ran. As the other officers searched Esco, he denied having a gun and explained that he ran only because he had "a lot of weed on me." R. 8-2 at 4:23; R. 8-4 at 2:20. Just after Esco's denial, Officer Cledon, informed his fellow-officers, "we got the gun." R. 8-2 at 4:25; R. 8-4 at 2:23.

A few seconds after Officer Lopez arrived at the scene of the arrest, he let an officer on the scene know that his partner, Officer Segovia, had recovered the weapon. As the officers continued to recount to one another what had happened, an unknown officer approached Officer Cledon and said, "that's not the same guy that they were looking at with the cameras." R. 8-2 at 4:50. Officer Cledon responded, "he was with him. We got that guy too. We got the gun." R. 8-2 at 4:52. Officer Lopez then made a phone call to Officer Segovia in which the two exchanged information about what was happening in either location, and Officer Segovia confirmed again that he had recovered the weapon. When the call ended, Officer Cledon continued to talk with various officers at the scene of Esco's arrest and explained, while gesturing toward Esco, "he walked up to the car. Tossed the gun. He took off running." R. 8-2 at 5:37. Shortly after finishing the search of Esco, Officer Cledon asked Officer Lopez "this guy just has weed?" to which Officer Lopez responded, "No, he's the one that tossed it," gesturing at Esco. R. 8-2 at 5:58. In sum, by the end of Esco's arrest, all of the relevant officers on the scene had heard

by way of radio communications or direct communications that their fellow officers saw Esco with a gun, recovered the weapon, and then pursued and detained the man who threw it.

Back at the location where the gun was discarded, Officer Segovia relayed to arriving officers that he had "watched the guy put the gun under there," gesturing to a car. R. 8-1 at 6:09. He repeated the information about seeing Esco put the gun under the car to those officers no less than five times. About a minute later, Officer Segovia answered a phone call and explained: "The guy that ran, that they grabbed, he's the one I watched put the gun under the car. I promise, I saw him right with my eyes." R. 8-1 at 10:50. The last minutes of Officer Segovia's body-worn camera video are filled with his relaying again and again how he watched Esco throw a gun under the car.

Viewed as a whole, the video undoubtedly supports a finding that the officers had probable cause to believe that Esco was the person who possessed and then discarded the weapon. At the moment Officer Segovia excitedly exclaimed to Officers Lopez and Cledon that the man who was running, and whom they were chasing, just discarded a gun, he not only demonstrated his own belief that Esco possessed a weapon, but he also relayed to the two other officers information that gave them probable cause to stop Esco. An identification by even one eyewitness who lacks an apparent grudge against the accused person is sufficient to demonstrate probable cause. *Moorer*, 92 F.4th at 721. And police officers can rely on directions and information transmitted from one officer to the other to establish probable cause. *United States v. Hensley*, 469 U.S. 221, 233–35 (1985); *United States v.*

*Parra*, 402 F.3d 752, 764 (7th Cir. 2005). Esco also did not respond to Officer Segovia's verbal commands to "come here" and to "stop." R. 8-1 at 3:02, 3:04. We cannot know whether Esco heard the commands or not, but because the reasonableness of an arrest is evaluated from the viewpoint of the officer, Esco's failure to heed his commands factored into his reasonable belief that Esco had committed or was committing a crime. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.")

The video also shows Officer Segovia quickly recovering the weapon under the car without much search, verifying for him that what he thought he saw, did, in fact, happen. Officer Segovia's later assertions of certainty, made only minutes after that first exclamation, lend further support to the notion that Officer Segovia firmly believed that Esco possessed a weapon. *See, e.g.,* R. 8-1 at 6:08 ("I watched him put the gun under there"); R. 8-1 at 6:53 ("I saw him put the gun"); R. 8-1 at 7:06 ("I watched him go like this and put it under there, and I said hey, that's them, that's him"); R. 8-1 at 9:27 (noting that he witnessed Esco "thr[o]w that shit right under the car too"); R. 8-1 at 10:26 ("I could literally see, saw him fucking throw it"). Importantly, he also conveyed this information to the officers at the arrest scene. *See* R. 8-1 at 10:50 ("The guy that ran, that they grabbed, he's the one I watched put the gun under the car. I promise, I saw him right with my eyes."). He then repeated the story to Officer Lopez several more times when the latter returned to the squad car. In sum, the video provides definitive evidence that Officer Segovia believed that Esco threw the weapon. But more importantly for the objective probable cause standard, it definitively demonstrates that

a reasonable officer standing in Officer Segovia's shoes would have had reason to believe that Esco had committed a crime.

The video also supports a finding that a reasonable officer hearing, seeing, and knowing what the other officers did, would have had reason to believe that Esco committed a crime. In addition to hearing Officer Segovia yell that the man they were chasing discarded a gun and was running, they heard confirmation that he recovered the weapon, verifying that Officer Segovia was correct about seeing a discarded weapon. The arresting officers found Esco running north-bound and matching the description Officer Cledon gave over the radio, thus confirming in their minds that Esco was the same person who had the weapon. Officer Cledon made clear to the arresting officers, "we got the gun." R. 8-2 at 4:25.

Esco's primary support for his theory that the officers knew he was not the person in possession of the gun comes from a statement that can be heard on Officer Cledon's body-worn camera video. On that video, an officer not involved in the original sighting or chase said to Officer Cledon, "hey, that's not the same guy that they were looking at with the cameras." R. 8-2 at 4:50. The defendants concede that this was true; Esco was not the "same guy" that the officers were originally looking at with the POD. There were two distinct crimes with two distinct weapons in this case. The police arrived at North Pine Avenue to investigate one crime involving a man with a weapon, but on route, they came upon a second crime in which a suspect (Esco) threw a weapon under a car and ran. Officer Cledon immediately cleared up the unknown officer's confusion saying, "he was with him. We got that guy **too**. We got the gun." R. 8-2 at 4:52 (emphasis ours). The unknown officer answered "oh," without adding any

further information that would indicate that Officer Cledon was incorrect or that he knew something that Officer Cledon did not. Officer Cledon then continued to talk with various officers at the scene and explained, while gesturing toward Esco, "he walked up to the car. Tossed the gun. He took off running." R. 8-2 at 5:37.

Esco also argues that Officer Cledon was confused about whether Esco had a gun, because he asked Officer Lopez at the end of the arrest "this guy just has weed?" R. 8-2 at 5:58. *See* Esco Br. at 15. We cannot know exactly what Officer Cledon meant by his question—whether he was inquiring whether Esco had other drugs too; whether he was clarifying whether the man detained in the squad car was the same man he had been chasing, or something else. We need not resolve whether, during this high adrenaline chase and quick aftermath, there were occasional moments of confusion. Probable cause depends on the totality of the circumstances. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Temporary confusion by a bystanding officer who was not involved in the pursuit and arrest, or requests for assurances about the factual circumstances, factor into an assessment of the totality of the circumstances but cannot upset other clear indicia of probable cause.

Long before his question to Officer Lopez, Officer Cledon appeared confident in his knowledge that Esco tossed the gun and ran, conveying to the other officers that the suspect they chased had a weapon and it had been recovered. *See* R. 8-2 at 5:37 (Officer Cledon gesturing toward Esco and explaining to the other officers at the scene of the arrest, "he walked up to the car. Tossed the gun. He took off running."). And any confusion that the unknown officer had about whether Esco had a gun was quickly cleared up. Collectively, therefore, the

officers had more than sufficient knowledge, either firsthand, or from other officers, to have probable cause to arrest Esco on the weapons charge. And because the officers had probable cause to believe that Esco had committed a crime, they therefore had probable cause to detain him pending criminal proceedings on that charge.[4]

## B. Malicious prosecution

Esco also makes a claim under the highly disfavored Illinois state tort of malicious prosecution. *See Levin v. King*, 648 N.E.2d 1108, 1110 (Ill. App. Ct. 1995) ("Illinois courts have long disfavored actions for malicious prosecution") (*citing Schwartz v. Schwartz*, 8 N.E.2d 668, 670 (Ill. 1937)). To establish a claim for malicious prosecution, a plaintiff must show: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996); *see also Holland v. City of Chicago*, 643 F.3d 248, 254 (7th Cir. 2011) (same).

---

[4] The district court came to the same conclusion that we do. *See* R. 27 at 8; *Esco*, 651 F. Supp. 3d at 922 (finding that "the arresting officers reasonably believed that *plaintiff* threw the gun that Officer Segovia recovered from under the car … .") (emphasis in original). The district court, however, also relied on the discovery of the cannabis to justify the arrest on the theory that "[a]n arrest may be supported by probable cause that the arrestee committed any offense, regardless of the crime charged or the crime the officer thought had been committed." R. 27 at 14; *Esco*, 651 F. Supp. 3d at 924 (*quoting United States v. Shields*, 789 F.3d 733, 745 (7th Cir. 2015)). Because we find that a reasonable officer could conclude that Esco had committed a weapons crime, we need not, and do not, rely on the discovery of the cannabis to justify the full arrest.

Because, as step three implies, probable cause is a complete defense to a claim for malicious prosecution, our conclusion above—that the police officers had probable cause to detain Esco for the weapons offense—eviscerates any claim of malicious prosecution. *See Washington v. City of Chicago*, 98 F.4th 860, 863 (7th Cir. 2024) (noting that the existence of probable cause is a defense to both Fourth Amendment and Illinois malicious prosecution claims.)

In any event, Esco also failed to prove, as required by step two, that the proceeding terminated in his favor. Prior to any trial on the state court weapons charges, the court granted the State's motion to dismiss the charges *nolle prosequi*. For purposes of Illinois malicious prosecution claims, bare evidence of a *nolle prosequi* does not establish that the underlying criminal proceeding was terminated in the defendant's favor. *Swick*, 662 N.E.2d at 1242. Esco held the burden to demonstrate that "the *nolle prosequi* was entered for reasons consistent with his innocence." *Id.* at 1243. "The circumstances surrounding the abandonment of the criminal proceedings must compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution." *Id.* Esco offers nothing more than the bare evidence that the state court entered a *nolle prosequi* order, without explanation of why the court entered the order. This is insufficient under Illinois law as evidence of a favorable termination of criminal proceedings.

## C.  The remaining claims

Because Esco's Fourth Amendment and state law malicious prosecution claims have been defeated, the claims for indemnification by the City and for respondeat superior also fail. Additionally, the district court did not abuse its

discretion in dismissing Esco's complaint without the opportunity to replead. District courts have broad discretion to deny leave to amend the pleadings where the amendment would be futile. *Russell v. Zimmer, Inc.*, 82 F.4th 564, 572 (7th Cir. 2023). And here, our review assures us that any amendment would have, indeed, been futile. We therefore AFFIRM the judgment of the district court.